364 So.2d 1000 (1978)
STATE of Louisiana
v.
Jerry L. DAUZAT.
No. 62057.
Supreme Court of Louisiana.
November 13, 1978.
Rehearing Denied December 14, 1978.
*1001 Paul A. Bonin, Garrity, Levenson & Bonin, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Lindsay A. Larson, III, Asst. Dist. Atty., for plaintiff-appellee.
CALOGERO, Justice.
Defendant, charged by bill of information with simple burglary in violation of R.S. 14:62, was convicted, after a jury trial, of attempted simple burglary. Two weeks after the jury returned its verdict, the district attorney filed an information charging Dauzat as an habitual offender. After a hearing held in conformity with the procedure set forth in the habitual offender law, R.S. 15:529.1, defendant was adjudged a fourth offender and sentenced to the minimum term prescribed by the law, twenty years' imprisonment. Upon this appeal he urges four assignments of error for a reversal of his conviction and sentence.[1]
During the early morning hours of January 18, 1977, a resident of a second story dwelling in the 5500 block of Magazine Street in New Orleans, attracted by the sound of glass breaking, observed a man in a long black coat, whom he described as short, Caucasian and about forty years old, standing in front of a broken glass entrance door to a cleaning establishment on the other side of the street. The witness saw the man walk away briefly, then return, look around and enter the business place. For a period of about five minutes, the onlooker (who had called the police on seeing the man enter the cleaners) watched as the burglar rummaged through the establishment. He saw the man exit the store and noted that as the burglar stood outside a car pulled up and its occupant emerged to speak to the burglar. The occupant of the car was a plainclothes police officer, who was told by the burglar that the break-in was accomplished by two black youths. Believing the burglar's story, the plainclothes officer departed in search of the youths. Another officer arrived at the crime scene and from the witness learned of the ruse *1002 that the burglar had successfully perpetrated. Armed with information from the witness, including a somewhat more detailed description of the burglar than he had theretofore possessed, the second officer commenced a search for the perpetrator. He saw defendant hiding behind a car at a location only one block away from the scene of the burglary, arrested him and returned him to the scene of the robbery where both the plainclothes officer and the witness to the burglary identified the arrestee. This prosecution ensued.

ASSIGNMENT OF ERROR NO. 1
By this assignment of error defendant complains that the one-on-one in-field identification was unnecessarily suggestive, so that introduction of evidence relating to that identification was reversible error. Defendant argues in brief that one-on-one identifications are prohibited, except in exceptional cases recognized in federal and state jurisprudence such as when the witness is ill and may be the only person who can exonerate the accused or when the witness is unable to come to court or jail. Nevertheless, the defense brief recognizes that although one-on-one, on-scene identifications are viewed as suggestive, courts are required to view the totality of the circumstances in determining whether exclusion of the identification is required under the rule enunciated in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The defense urges that the identifications at the scene were suggestive because Dauzat was the only person in the back of the police unit when identifications were sought by the arresting officer from the witness and the plainclothes officer. The brief then highlights alleged uncertainties and ambiguities in the identification of Dauzat reflected in the testimony of the witness and the plainclothes officer.[2] The defense argues that these factors, considered together, establish that the pre-trial in-field identification should have been suppressed.
Where, as in the instant case, a one-on-one in-field identification is closely associated in time with the commission of the crime and where the suspect is returned to the location of the crime for immediate identification, such identifications have been found permissible. State v. Kelly, 362 So.2d 1071 (La.1978). One reason for declining to disapprove such procedures is that they promote fairness by assuring reliability and the prompt release of innocent suspects. State v. Dunbar, 356 So.2d 956 (La.1978). Applying the totality of the circumstances rule set forth in Neil v. Biggers, supra, (more recently asserted by the United States Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 [1977]) we conclude that the record establishes the reliability of the in-field identifications. The testimony fails to establish that there was any suggestion to the witness that the person in custody was the perpetrator, and the plainclothes officer stated that although his identification came later in time than that of the witness, he did not know at the time of his identification of Dauzat that the witness had previously identified him. The asserted ambiguities and uncertainties upon which defendant relies so heavily in attacking the in-field identification, when viewed *1003 in the context of the entire testimony of the witness and the officer, fall short of establishing unreliability in the identifications. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 3
At the conclusion of the State's case in chief, defendant Dauzat took the stand to testify on his own behalf. During his testimony, he denied that he had a fresh cut on his hand at the time he was arrested and maintained at some points during his testimony that he did not own a black trench coat about which the state repeatedly inquired. To rebut Dauzat's testimony the state sought to introduce the black coat Dauzat was wearing at the time of his arrest, which apparently was blood stained. Until the time that the garment was retrieved by an Orleans Parish Deputy assigned to duty at the Parish Prison, it was stored in a box issued to Dauzat and kept in his cell, along with the prisoner's personal property (toilet articles, mail and the like). When at trial it became apparent to the defense that the state planned to introduce the coat, its suppression was sought on the grounds that the seizure was unlawfully effected, without a warrant, without consent, and not incident to a lawful arrest. Defense sought a hearing on the motion. The trial judge refused to afford defendant a hearing and simply ruled that no warrant is needed for seizure of a prisoner's belongings from his jail cell.
While the jurisprudence seems to establish that prisoners are not totally deprived of Fourth Amendment rights by virtue of their incarceration, the existence and extent of such rights appear to depend in large measure on the prisoner's expectation of privacy and the reasonable nature of that expectation. Numerous cases upholding a prisoner's Fourth Amendment rights (as well as cases with a contrary holding) are collected in the annotation on unreasonable searches of, and seizures from, prisoners appearing at 32 A.L.R.Fed. 601 (1977). In none of these cited cases, however, has it ever been found that a prisoner (including a pre-trial detainee) has Fourth Amendment rights to belongings within his jail cell which purport to be evidence.
We conclude that the trial judge was correct when he held that seizure of the defendant's coat (evidence in this case) from a box within his jail cell did not require a warrant and that defendant was thus not entitled to a hearing on his motion to suppress.

ASSIGNMENT OF ERROR NO. 5
Defendant contends that the trial court's refusal to give a special requested charge on the issue of identification, crucial in this trial, was error warranting reversal of his conviction and sentence. We have reviewed the content of the requested special charge and the general charge given by the court to the jury. Our examination reveals that the general charge includes the special requested charge, obviating the need for giving the charge sought. C.Cr.P. art. 807. This assignment is without merit.

ASSIGNMENT OF ERROR NO. 7
Defendant filed a motion for new trial, the thrust of which was a claim that apart from the identification evidence and the tangible evidence in the form of the black coat, illegally introduced at trial, there was no evidence to support the conviction. Dauzat conceded in brief that the merit of this assignment depends entirely on the Court's disposition of Assignments Nos. 1 and 3. Having determined that the other assignments relied upon do not warrant reversal, we find that this assignment is likewise without merit.

Decree
For the reasons heretofore stated, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The record contains nine assignments of error. However, only the four which are briefed are considered upon this appeal.
[2] The witness to the burglary testified at trial that his inability to positively state at a preliminary hearing that defendant was the person he identified as the burglar on the night of the crime stemmed from the fact that his identification of the defendant was a general appearance identification, not a face identification. Yet, his initial trial identification of Dauzat was unqualified, unequivocal. After cross-examination during which the defense highlighted the preliminary hearing statement that the witness believed Dauzat to be the man he identified on January 18, 1977, but was not positively certain (only "pretty sure"), the witness persisted in his identification by stating that although he was unable to say that he was absolutely certain that Dauzat was the man he had seen, it was his belief that Dauzat was the man.

The plainclothes officer's perceptions are questioned on the basis of cross-examination relative to the officer's inability to state whether the man to whom he spoke upon first arriving at the burglary scene was Negro or Caucasian. This inquiry stemmed from testimony on direct examination to the effect that the person first encountered at the scene was dark complexioned but that the officer could not discern whether the man was actually white or a light complexioned "colored person."