749 So.2d 917 (1999)
STATE of Louisiana, Appellee,
v.
Richmond BARBER, Appellant.
No. 32,894-KA.
Court of Appeal of Louisiana, Second Circuit.
December 30, 1999.
*919 Louisiana Appellate Project by Amy C. Ellender, Mer Rouge, Counsel for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Madeline M. Slaughter, Assistant District Attorney, Counsel for Appellee.
Before BROWN, PEATROSS and DREW, JJ.
DREW, J.
Richmond Barber was convicted of the February 2, 1996 armed robbery of a Toddle House employee in Monroe and sentenced to 25 years at hard labor without benefit of parole, probation or suspension of sentence. Barber was charged by a Bill of Information as an Habitual Felony Offender, but a hearing was apparently never held. Barber appeals his conviction and sentence, arguing that the trial court erred in failing to suppress an out-of-court identification, the evidence is insufficient and the sentence is excessive.
We affirm the conviction and sentence.

FACTS
Rebecca Ferris was employed as a cook at the Toddle House restaurant in Monroe. She was the only employee working the 10:00 p.m. to 6:00 a.m. shift on the date of the robbery. When Ferris began her shift, there was about $75 in the cash register, consisting mostly of $45-$65 in bills. Until Richmond Barber walked in the restaurant around 4:00 a.m. on February 2, 1996, there had been no sales during Ferris's shift. Monroe was in the middle of an ice storm at the time.
Barber entered the restaurant and told Ferris that he was cold and wanted something to drink. Ferris gave Barber coffee. Ferris recalled that when Barber came into the restaurant, he told her his name was "Rick." Barber asked Ferris where the bathroom was. Ferris watched Barber as he walked towards the bathroom. After several minutes, Barber returned to his seat. Ferris began preparing Barber's breakfast order. As she placed bacon on the grill, Barber walked behind her and stuck a knife against her back. She was able to see the knife handle. Barber told Ferris, "Bitch, I don't want to kill you. I just want your money." Ferris thought Barber smelled of alcohol.
Barber ordered Ferris to open the restaurant's cash register, and he removed the cash and placed it in his pockets. He then told Ferris that he needed to do something with her, but did not know what. Tying Ferris's hands with an electrical cord from a restaurant calculator, Barber ordered her to the back of the restaurant. The knife was kept to her back as they walked. Ferris testified that when they reached the rear of the restaurant, Barber threw her up against a telephone and told her that "[h]is intentions were not to hurt anybody, but, at that point he was scared and he was going to prison anyway so, he figured he's just have to stab me 27 times and rape me before leaving me dead because he was going to go to prison anyway." Ferris took the threats seriously because Barber said he was scared and did not care.
Ferris estimated that she and Barber were in the rear of the restaurant for five to ten minutes. Barber moved the knife to Ferris' throat and slammed her against *920 the wall. With his other hand running down Ferris' shirt, Barber began kissing her. When she saw the knife in her face, Ferris thought she was dead so she slid down the wall.
As Barber began to undo the top two buttons of her shirt, Ferris begged him to stop and to leave. Barber, thinking that someone across the street had noticed him in the restaurant, told Ferris he was going to have to kill her. Ferris responded that the person probably thought he was just a customer and that everything would be alright if he just left the Toddle House. As Barber left the restaurant, his last words were, "If I go to prison I'll kill you." Barber left Ferris sitting on the floor in the rear of the restaurant with her hands tied behind her back. Because her hands were loosely tied, Ferris was able to free her hands as soon as Barber walked out of the restaurant. Ferris watched Barber as he walked across Louisville Street. She grabbed the phone and called 911, reporting the robbery and giving a description of the robber and the direction he was heading. Ferris sat back down on the floor, fearful of Barber's warning that he would kill her if she "raised up." Ferris testified that no one entered the restaurant from the time Barber left until the first officer arrived about 10 to 15 minutes after Ferris made the call. The initial call was dispatched at 4:02 a.m. The dispatcher announced to the officers that the suspect was a black male wearing light-colored jeans and a dark jacket with writing on the back.

Investigation and search for the suspect.
Officer Marty Glass went to the Toddle House after receiving the call. He received a description of the suspect from Ferris and relayed this description to the other police units responding to the call. The description was of a tall, heavyset black male wearing a dark jacket and faded jeans. He did not remember whether he said anything about a cap or gloves when broadcasting the description.
Monroe Police Officer James Marlowe, driving an unmarked police unit, observed Barber walking at a fast pace through a parking lot near the intersection of North Third Street and Pine. Marlowe noticed that Barber fit the description of the suspect who had robbed the Toddle House employee since he was a tall, heavyset black male wearing a dark jacket and light jeans. Marlowe, wearing his police uniform, exited his car, identified himself as a police officer and asked Barber to come to the car. Barber became belligerent and cursed the officer, saying he had not done anything wrong and did not have to talk to Marlowe. As Barber kept moving away, Marlowe drew his revolver. Barber continued moving away, went behind a van, knelt down and placed money under the tires. When he finished, Barber began walking back towards the officer. Marlowe noticed that Barber's attitude had suddenly changed, that Barber was now speaking in a polite manner.
Sgt. Mike Walker arrived to assist Marlowe. When he arrived, he found Marlowe with his weapon pointed at Barber and ordering Barber to put his hands and body on the hood of his police car. When Walker got behind Barber and tried to put him on the car in order to cuff him, Barber began struggling. Walker used his pepper spray to subdue Barber.
After Barber was placed in a police car, Marlowe and Officer Paul Brown searched the area near the van where Barber had knelt down. They recovered approximately $40 in bills. Some money was found wadded under a tire. Other money had been blown across the parking lot by heavy winds. Six $1 bills were later recovered from Barber's pants pocket after he had been booked.
Barber left footprints in the ice and snow which covered the ground. Officer Brown followed the footprints from where the money was found, through an alley and across Louisville Avenue to the Toddle House. There was only a single set of tracks. He first followed the footprints all *921 the way back to the restaurant before looking for a weapon. Then he again walked this path while searching for a knife. A knife was found in an alley behind an appliance store which is across the street from the restaurant. Brown could tell the footprints near the knife were coming from the Toddle House.
Monroe Police Sgt. Jim Gregory was accepted as an expert in fingerprint identification and crime scene analysis. Gregory did not fingerprint the cord used to tie Ferris's hands because he had never gotten prints from an electrical cord before. He fingerprinted the coffee cup, spoon and creamers used by Barber. Of all the fingerprints he attempted at the crime scene, Gregory was able to lift just five latent prints, only one of which was of any value because the other prints were not of sufficient quality to make an identification. The one print of any value to him was a palm print taken from the front entrance door. This print was not identified as belonging to Barber. No identifiable prints were taken from the knife found in the alley, the Toddle House counter top or the coffee mug, spoon and creamer packages used by Barber. Gregory explained that a person is less likely to leave good fingerprints when the weather is cold because the hands tend to be drier. Gregory agreed that it is possible that hands recently removed from gloves are less likely to leave fingerprints. Ferris testified that Barber removed his gloves when he entered the restaurant.
Sgt. Gregory took photographs of the restaurant and footprints, including footprints heading from the Toddle House towards an appliance store across the street. Although he could not positively identify the shoes worn by Barber as having caused the footprints, he did note similarities between the photos of the footprints and the shoes worn by Barber. Both the footprints and shoes are longer than the 30cm scale he used for the photos. The outer areas of the footprints have ridges or parallel lines and there are small dots or circles in the inner portion of the footprints. These are also found on the shoes seized from Barber.
Detective William Webb recovered a blue jacket, shirt, light blue jeans and a pair of work boots from Barber. He also discovered $6 in one dollar bills in the pockets of Barber's pants. A black stocking cap and black gloves had been seized by other officers. There is no writing on the back of the jacket. But on the front of the jacket, "Hightower" is written on the right breast and "Diamond Offshore" is written on the left breast.

Identification
Barber was returned to the restaurant where he was positively identified by Ferris as the individual who had robbed the restaurant. Detective William Webb testified that during the booking process, Barber kept saying that he had been cleaning up at a local bar, Roper's Saloon, from 2:00 a.m. to 4:00 a.m. and that when he walked outside the bar, the police approached him. Wade Wyatt, the owner of Roper's, testified that Barber never worked for him. Wyatt further testified that Barber came into the bar between 1:30 and 2:00 on the morning of February 2nd and asked if he could borrow $10. Wyatt loaned Barber the money.
Barber testified at trial about his activities the night of the robbery. Employed by the Municipal Police Officer's Association, he had been paid $80 on February 1st and had gotten off of work at 5:30 p.m. on that date. Barber spent several hours at his home after purchasing cigarettes, beer and a lottery ticket. Barber's home is across the street from the front entrance of Roper's. Because he owed his landlord for his rent, he borrowed $10 from a neighbor around 9:00 that evening. Barber testified that he owed his landlord $100 and had already gotten a $50 money order. Billy Dixon, Barber's landlord, testified that Barber rented a room from him and owed him $275 in rent at the time of his arrest.
*922 According to Barber, he spent the next several hours going back and forth between his house, Roper's, the residence of a friend named Skinny and a store to call his girlfriend. Barber testified that he was at Roper's at closing time, around 2:00 a.m., and afterwards he spent 35-40 minutes talking to a bouncer in the parking lot. Barber told the jury that he returned to his home to use the bathroom, then went back to Skinny's, where he purchased marijuana and two rocks of crack cocaine for $20. Barber testified that he purchased the drugs for others. According to Barber, when he left again to make another call and to check on his house, he was stopped by Officer Marlowe. Once Marlowe identified himself as a police officer, Barber testified that he became fearful of being caught with drugs so he began scattering the contents of his pockets near a moving van. Barber denied robbing anyone at the Toddle House or even going there that night.
Barber was charged by amended bill of information with committing armed robbery in violation of La. R.S. 14:64. A motion to suppress Ferris's later identification on the morning of the robbery was filed on June 7, 1996. The trial court denied the motion to suppress. Barber was convicted as charged.

DISCUSSION

Motion to Suppress
Barber contends that the trial court erred in denying his motion to suppress. He argues that the trial court should have suppressed the out-of-court identification because the one-on-one identification at the crime scene was highly suggestive and unduly prejudicial. Barber further argues that there was a strong likelihood of misidentification.
In seeking to suppress an identification, the defendant must prove the procedure used was suggestive and that the totality of the circumstances presented a substantial likelihood of misidentification. State v. Martin, 595 So.2d 592 (La.1992); State v. West, 561 So.2d 808 (La.App. 2d Cir.1990), writ denied, 566 So.2d 983 (La. 1990).
One-on-one confrontations between a suspect and a victim, while not favored by the law, are permissible when justified by the overall circumstances. Such identification procedures are generally permitted where the accused is apprehended within a short time after the commission of the offense and is returned to the scene of the crime for on-the-spot identification or when identification is made shortly after the commission of the crime. State v. Dauzat, 364 So.2d 1000 (La.1978); State v. Patrick, 31,380 (La.App.2d Cir.10/28/98), 721 So.2d 94, writ denied, 98-2957 (La.3/19/99), 739 So.2d 780; State v. Cotton, 511 So.2d 1207 (La.App. 2d Cir. 1987). Such prompt identification, under appropriate circumstances, promotes accuracy as well as expediting the release of innocent suspects. State v. Williams, 420 So.2d 1116 (La.1982); State v. Bickham, 404 So.2d 929 (La.1981); State v. Patrick, supra; State v. Cotton, supra.
The U.S. Supreme Court has approved several factors for evaluating whether the reliability of an identification may outweigh the suggestiveness of the procedures employed. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. Davis, 27,961 (La.App.2d Cir.4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12. The factors are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the victim's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Even if suggestiveness is proven by the defendant, it is the likelihood of misidentification, and not the mere existence of suggestiveness, which *923 violates due process. State v. Williams, 375 So.2d 364 (La.1979); State v. Davis, supra.
When reviewing a trial court's ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion but also may consider pertinent evidence given at trial. State v. Goodjoint, 30,727 (La.App.2d Cir.6/24/98), 716 So.2d 139; State v. Reed, 97-812 (La.App. 1st Cir.4/8/98), 712 So.2d 572, writ denied, 98-1266 (La.11/25/98), 729 So.2d 572.
Ferris described what happened during the identification. The police told her that they had picked up someone and needed her to look at him. Ferris was not sure how long it was after the robbery before the police brought Barber back to the Toddle House, but thought it might be between 20 and 25 minutes. The police offered to allow her to do the identification at the restaurant or at the police station. The identification was performed in front of the restaurant. Ferris stated that the police removed a handcuffed Barber from a police car and leaned him up against the car. Ferris was about 15 feet away from Barber before she moved within five or six feet of him. Because Barber tried to hide his face, the police had Barber raise his face so Ferris could see him. The entire process took about five minutes. Barber did not say anything during the identification. No one suggested to Ferris that Barber was the man who robbed her or that she had to identify Barber as the robber.
Ferris testified that she used Barber's clothing and physical characteristics to identify him. Ferris described the person who robbed the restaurant as clean-shaven and wearing jeans, a dark jacket with writing on it, cap, gloves and dark shoes. She thought that the dark shoes, which laced up, resembled tennis shoes. Detective Webb called the shoes "work boots." Ferris recalled that Barber had his cap on at first during the identification, but then it came off. Barber did not have his gloves on when he was brought back for the identification.
Sgt. Walker estimated that 30 to 45 minutes elapsed between the time Barber was arrested until he was taken back to the Toddle House. Officer Glass believed that no more than 20 minutes elapsed between the initial call and the identification.
Contrary to Ferris's testimony, Sgt. Walker did not recall Barber being removed from the car for the identification. He also believed that Ferris stayed in the restaurant's foyer and identified Barber while looking through a glass door. Officer Glass also testified that Barber remained in the back of a patrol car parked in front of the restaurant during the identification. He recalled how he and Ferris stood in the restaurant's doorway for the identification, looking through an open door, while standing about 15 to 20 feet away. Glass was not sure if the door to the police car was open or if lights were on in the car. He believed that the interior of the police car was illuminated by flashlights. Barber testified that the officers took him out of the car and leaned him against the car for the identification.
Sgt. Walker testified that the description of the suspect relayed by the dispatcher was of a black male wearing light-colored jeans and a dark jacket with writing on the back of it. In fact, there is no writing on the back of the jacket. However, the words "Hightower" and "Diamond Offshore" are written over the right and left breasts of the jacket respectively. Ferris explained that while she was sure there was writing on the jacket, she was not sure whether the writing was on the back or front of the jacket. She identified the jacket seized from Barber as the jacket worn by the robber.
Barber contends that the identification was unreliable. He emphasizes Ferris's description of the suspect as clean-shaven and as wearing a jacket with writing on the back. He also references the conflicts in testimony between the law officers and *924 Ferris about whether or not Barber remained in the police car during the identification. Even though Barber apparently has facial scars, Ferris did not notice any marks on his face.
Ferris was incorrect in her description of Barber's jacket as having writing on the back. However, Ferris was correct in stating that there was writing on the jacket, albeit on the front of the jacket. Ferris was simply confused about the placement of the writing. In any event, her description of Barber's clothing was otherwise correct.
When Ferris was asked by the police if Ferris had a mustache or beard, she replied, "No. He had a pretty clean face." Barber's booking photograph shows him as having a thin moustache and small goatee. Confronted with Barber's booking photo, Ferris stated:
Well, he has a small mustache with a small goatee, but, the rest of his face was clean. I don't know that much about whether it's large bunch of hair, I mean, you know, there is a difference between being hairy and being clean.
Apparently, Ferris personally considered Barber to be clean shaven. Perhaps she would have been clearer in her explanation had she described him as well-groomed. This is evident from the following testimony:
Q: Now, the person that robbed you, I want to make sure that I have your identification of the person that robbed you. I want to make sure I understand these things. He was clean shaven.
A: Pretty much. I've seen some bad shaven people.
Ferris described Barber's hair as being "real short" or "baldlike." Ferris explained what she meant by this description:
Q: And he was as you described him, bald or in a balding condition.
A: It was very short hair at the time. Very short hair.
Q: I believe you used the term looked like he was almost bald.
A: It was still short hair. I mean, there's a bald as in Kojak. But that's not what I'm talking bald. He had short hair. Near none at the time. It was short.
Ferris described the robber's shoes as looking like black tennis shoes that were laced up. When shown the shoes seized from Barber, Ferris stated that the shoes looked identical to the ones the robber was wearing. She also agreed the shoes did not look like tennis shoes.
The testimony by the state's witnesses concerning whether or not Barber was in the car for the identification is inconsistent. However, Ferris's testimony that Barber was removed from the car is consistent with Barber's own testimony.
The robbery was not the first time Ferris had ever seen Barber as she had previously seen him in the area of the restaurant, although she did not think he had previously come into the restaurant. She had never had a conversation with him prior to the date of the robbery. Ferris was certain that Barber was the person who had robbed the restaurant when she identified him. She also identified Barber in court as the person who had robbed the restaurant. Officer Glass testified that Ferris identified Barber immediately.
Ferris had ample opportunity to look at Barber and commit his appearance to memory. She estimated that Barber was in the restaurant between 15 and 20 minutes. She testified that she paid attention to him and observed him closely as soon as he entered the restaurant. She was also in a position to view Barber closely when he was kissing her. Barber was identified within 30 minutes after he left the restaurant.
We cannot say that the trial court erred in denying the motion to suppress. Any suggestiveness of the identification procedures used was outweighed by the overall *925 reliability of Ferris's identification. Under the totality of the circumstances presented by this record, there was no substantial likelihood of misidentification.

Sufficiency of the evidence
While the record does not indicate that Barber filed a motion for post verdict judgment of acquittal [La.C.Cr.P. art. 821], the record contains an assignment of error contending that the evidence is insufficient to sustain the guilty verdict. Appellate review is mandated by the assignment of error of the sufficiency of the evidence to convict whether or not the defendant exercised his Art. 821 option in the trial court. La.C.Cr.P. art. 920; State v. Green, 28,994 (La.App.2d Cir.2/26/97), 691 So.2d 1273.
The standard of review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560(1979); State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
Barber does not dispute that a robbery occurred, but only argues that he was not the perpetrator. When an accused asserts that he is not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Long, 408 So.2d 1221 (La.1982); State v. Anderson, 30,306 (La.App.2d Cir.1/21/98), 706 So.2d 598; State v. Powell, 27,959 (La. App.2d Cir.4/12/96), 677 So.2d 1008(on rehearing), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
Ferris identified Barber as the individual who robbed her and who threatened to rape and murder her. Footprints led from the restaurant to the parking lot where Barber was first spotted by the police. The knife used in the robbery was found along this trail of footprints. The streets in that area of Monroe were essentially deserted because of the winter weather. According to Officer Marlowe, from the time the call went out until Barber was arrested, he did not see anyone else walking because of the weather conditions.
The record establishes that the state negated any reasonable probability of misidentification. The evidence was sufficient to support the conviction of armed robbery.

Sentencing
After reviewing a PSI report, the trial court sentenced Barber to serve 25 years at hard labor without benefit of parole, probation or suspension of sentence. Barber filed a motion for reconsideration of sentencing, arguing that the sentence is excessive. The trial court denied the motion to reconsider.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. Barber concedes that the trial court adequately complied with Art. 894.1.
The second prong is whether the sentence imposed is unconstitutionally excessive considering the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment *926 are considered in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
A trial court has wide discretion in imposing a sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, we will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Washington, 29,478 (La.App.2d Cir.4/2/97), 691 So.2d 345.
Barber was one month shy of his 40th birthday on the date of sentencing. He is apparently the father of three children. After leaving high school in the twelfth grade, Barber joined the Marines in 1973. Upon his honorable discharge from the Marines in 1976, Barber worked for less than a year as policeman in Tallulah. Over the next two decades, Barber worked on a production assembly line for a defense contractor and in the offshore oil industry. Barber has been previously convicted of five misdemeanors and one felony. The felony conviction is a 1991 conviction for unlawful use of a weapon in St. Louis, Missouri. He was placed on supervised probation for three years as a result.
The sentencing range for a conviction of armed robbery is imprisonment at hard labor for not less than five years and for not more than 99 years without benefit of parole, probation or suspension of sentence. La. R.S. 14:64. Barber's 25 year sentence is barely more than one-quarter of the statutory maximum.
Barber placed Ferris in fear for her life. She reasonably considered his threats to rape and kill her as serious, as he held her at knife point. This sentence is not purposeless, nor needless nor shocking to our sense of justice.
The record does not reflect that the trial court gave Barber credit for time served. However, credit for time served is self-executing under La.C.Cr.P. art. 880. Therefore there is no need to amend the sentence.

DECREE
The conviction and sentence are AFFIRMED.