870 So.2d 607 (2004)
STATE of Louisiana, Appellee
v.
Terry Dale TILMON, Appellant.
No. 38,003-KA.
Court of Appeal of Louisiana, Second Circuit.
April 14, 2004.
Rehearing Denied June 17, 2004.
*609 Terry Dale Tilmon, in Proper Person.
Paula Corley Marx, Peggy J. Sullivan, Louisiana Appellate Project for Appellant.
Paul J. Carmouche, District Attorney, J. Thomas Butler, Yolanda W. Mitchell, Laura O. Wingate, Assistant District Attorneys, for Appellee.
Before BROWN, GASKINS, and DREW, JJ.
BROWN, C.J.
Defendant, Terry Dale Tilmon, was charged with simple burglary. He was tried by a six-person jury and convicted as charged. Thereafter, he was adjudicated to be a third felony offender and sentenced to 24 years at hard labor without benefit of probation, parole, or suspension of sentence. Defendant now appeals. We affirm.

Facts
Defendant was charged by bill of information with the simple burglary of a vehicle owned by Kathleen Fetsch on June 26, 1999. The crime occurred in the parking lot of a public park commonly known as the "Duck Pond" located on East Kings Highway in Shreveport, Louisiana. On that day at about five o'clock in the afternoon, Sherelle Netter, who at the time was employed with the Shreveport Police Department as a 911 operator, parked her vehicle at the Duck Pond to look at a real estate book. Parked on the passenger's side of Ms. Netter's vehicle was a silver/gray car. Ms. Netter noticed a maroon Lincoln Town Car enter the parking lot and park on the other side (the driver's side) of her car. She saw the right side of the driver's face and observed that he was a black man. She could see nobody else in the Lincoln. The maroon Lincoln changed parking spaces, moving next to the silver/gray vehicle. Ms. Netter thought it was odd and looked over at the left side of the driver's face. The man got out of his car with a fishing pole and walked down to the pond. He later returned to the parking lot without the fishing pole. Ms. Netter observed the man walk between the maroon Lincoln and the silver/gray vehicle, at which time he bent over and began "messing" with the door handle of the passenger side of the silver/gray vehicle. She saw the man's hands on the windowsill of the silver/gray car. Ms. Netter then telephoned 911 and reported the entire incident as it transpired.
Ms. Netter watched the man get a crowbar/tire tool from the Lincoln and smash out the passenger side window of the silver/gray car. Ms. Netter then pulled her vehicle out of the parking lot and drove directly across East Kings Highway onto Atlantic Street to get a better look at the maroon Lincoln and to see if she could get the license tag number to report to the police (she was unable to do this). She parked in a driveway on Atlantic Street and observed that the man was inside the silver/gray vehicle. She saw the vehicle's trunk open and watched the man take a light-colored object out of the trunk. Ms. Netter reported to the 911 operator that the man had a medium complexion, was wearing a gray shirt, khaki shorts, flip-flop type shoes, and glasses, and did not have a gun.
Sergeant J.D. Reich of the Shreveport Police Department testified that he arrived at the Duck Pond as the Lincoln was attempting to leave the parking lot. Sgt. Reich pulled into the lot and got out of his police car. He ordered the man, who was the only occupant, to stop, but the man drove away. Sergeant Reich testified that he had to move out of the way to keep from being hit by the fleeing vehicle.
Detective Lane Smith testified that he heard the police radio broadcast about the *610 burglary which described the man as dressed in gray, armed with a gun, and driving a maroon four-door Lincoln. Detective Smith observed the Lincoln pull out of the parking lot, and he pursued the vehicle at speeds of up to 120 miles per hour from East Kings Highway until the driver's apprehension. The driver of the Lincoln stopped in the Jackson Heights projects and fled on foot carrying a purse. According to Detective Smith, the driver was wearing a white or off-white t-shirt and khaki shorts. During the chase, the driver threw the purse onto a porch surrounded by decorative wrought iron. Detective Smith testified that he never lost sight of the driver during the chase. When the driver was apprehended on Allen Avenue, Detective Smith returned to where the purse had been discarded and recovered the handbag. Detective Smith made an in-court identification of defendant as the person he had chased and as the man who had been in possession of the purse. The recovered handbag was identified by the victim, Kathleen Fetsch, as hers, and it contained her personal effects.
Officer Harry D. Brown of the Shreveport Police Department was also involved in the high-speed pursuit of the Lincoln. He saw the driver, a black male, exit the car wearing a light-colored shirt and brown shorts and carrying what looked to be a brown purse. Officer Brown lost sight of the driver as he fled on foot. Once the driver was in custody, Officer Brown stated that he returned to the Duck Pond to transport Ms. Netter and the Fetsches to the police station.
When the chase started, Ms. Netter returned to the Duck Pond and located Kathleen Fetsch. The police requested that Ms. Netter and Mrs. Fetsch come to the police station. At the police station, Ms. Netter was taken down the hall and asked to look into a room at a man.[1] The man was handcuffed and seated at a table. Ms. Netter observed the left side of his face for about 15 or 20 seconds. Ms. Netter later positively identified the man in the room to Detective Lane Smith as the same man she saw commit the burglary.[2] The man in custody was wearing a gray shirt and glasses and had a medium complexion.
At trial, Ms. Netter made an in-court identification of defendant as the man she saw at the Duck Pond and as the man she identified at the police station. On cross-examination, Ms. Netter was asked whether she observed any scars or tattoos. Ms. Netter replied that she did not because things were "going so fast and so split-second," she didn't have a chance to notice "all of that." Ms. Netter was asked to note from her observance in court that defendant has a burn mark or scar that covers the majority of the right side of his face. When questioned about why she did not notice the scar on the day of the crime, Ms. Netter explained again that "everything happened so fast." Ms. Netter also explained that she did not notice the defendant's scar at the police station because she only saw the left side of his face. Ms. Netter was shown the defendant's tattooed forearms in court, and stated that she did not notice any tattoos on the man at the Duck Pond because she was looking at his face.
*611 The victim, Kathleen Fetsch, testified that on the day of the crime, she and her husband took their grandchildren to the Duck Pond to play. They drove her 1998 gray Honda Accord. She locked the doors of her car, and they went to feed the ducks. Mrs. Fetsch stated that defendant did not have permission to enter her car or to take her tan/brown purse out of the trunk of her Accord.
The defense introduced an affidavit signed by Ronald J. White on January 15, 2001.[3] In this affidavit, White stated that he committed the instant crime without defendant's knowledge or participation, drove the Lincoln while defendant was asleep, and broke into the vehicle and took the purse from the trunk. The affidavit stated that in the process, White cut his finger, put the purse under the seat of the Lincoln, and went to wash his hands at the park restroom. When he returned to the parking lot, defendant and the car were gone. White's signature was notarized by attorney Sam P. Love, Jr. At trial, Love testified that he did not prepare the document, which was brought to his office by defendant's brother, Wallace Tilmon. Approximately 30 minutes after Wallace Tilmon provided Love with the document, three other men came to Love's office. One man identified himself as Ronald J. White and signed the affidavit. Love did not ask for any proof of White's identity, nor did he swear in White before having him execute the document. Love testified that he simply asked the man whether his name was Ronald White and "he said it was."
Before trial, the defense filed a motion to suppress identification. A pro se motion to suppress evidence was also filed. A pretrial hearing was held and both motions were denied. A six-person jury found defendant guilty as charged of simple burglary. Defendant was subsequently charged as a fourth felony offender. Numerous pro se post-trial pleadings, including motions for new trial, post-verdict judgment of acquittal, discovery, and subpoenas, were filed by defendant. After several hearings, the trial court denied defendant's post-trial motions.
A motion to quash and objection to the habitual offender bill was also filed by defendant in proper person. After a hearing, defendant was found to be a third felony offender. The trial court deviated downward from the mandatory sentence of life imprisonment without benefit as provided by La. R.S. 15:529.1(A)(1)(b)(ii) and sentenced defendant to 24 years imprisonment at hard labor without benefit (the state has not appealed this deviation from the mandatory sentence). Defendant filed a pro se motion to reconsider sentence, which was denied by the trial court.

Discussion
Sufficiency of the Evidence
We have set forth the evidence in some detail. Defendant's argument centers on Ms. Netter's identification. Defendant argues that his identification as the perpetrator by Ms. Netter was unreliable and should not have been believed. He contends that Ms. Netter's description of the perpetrator to the police failed to include any distinguishing marks, such as his scar that covers the right side of his face, as well as tattoos on his arms.
Facts are not reviewable on appeal except to insure due process. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Jackson *612 standard is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have reasonably concluded that all of the elements of the offense had been proven beyond a reasonable doubt.
To convict a defendant of simple burglary of an automobile, the state must prove beyond a reasonable doubt that the defendant entered a vehicle without authorization, and had the specific intent to commit a felony or theft therein. State v. Bullard, 29,662 (La.App.2d Cir.09/24/97), 700 So.2d 1051; State v. Ewens, 98-1096 (La.App. 5th Cir.03/30/99), 735 So.2d 89, writ denied, 99-1218 (La.10/08/99), 750 So.2d 179.
A review of the record shows that the evidence was sufficient to support defendant's conviction of simple burglary. A rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could reasonably have concluded that all the elements of simple burglary were proved beyond a reasonable doubt. The victim's testimony, together with the testimony of Ms. Netter and the pursuing police officers, proved that defendant entered the victim's vehicle without authorization and had the specific intent to commit a felony or theft therein. See State v. Ewens, supra. The testimony of Ms. Netter and defendant's apprehension clearly identified defendant as the perpetrator. Specifically, the eyewitness, Sherelle Netter, had several opportunities to view defendant during the crime, was positive of the accuracy of her identification, and details of her description were corroborated by testimony given by the police officers. The cross-examination of Ms. Netter competently highlighted alleged inconsistencies. It was within the jury's province to weigh credibility. This court does not reassess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
This case, however, does not rest simply on the identification of Sherelle Netter. The police arrived as defendant was finishing the crime and maintained sight of defendant during a chase until his apprehension. The officers recovered the victim's purse they saw the perpetrator discard. Their identification of defendant is equally sufficient to support a guilty verdict.
Denial of the Motion to Suppress
Both defense counsel and defendant (pro se) filed motions to suppress the identification by Ms. Netter. Defendant argues that the procedure by which Ms. Netter identified him as the perpetrator at the police station was unduly suggestive and that it taints both her out-of-court and in-court identifications. He further questions the accuracy of Ms. Netter's descriptions, and her opportunity to observe the perpetrator at the crime scene.
The evidence of the police station identification boosts Ms. Netter's critical in-court identification. In State v. Barber, 32,894 (La.App.2d Cir. 12/30/99), 749 So.2d 917, 922, writ denied, 00-0519 (La.11/27/00), 775 So.2d 441, this court set forth the applicable law regarding victim identification of a defendant made shortly after the crime:
One-on-one confrontations between a suspect and a victim, while not favored by the law, are permissible when justified by the overall circumstances. Such identification procedures are generally permitted where the accused is apprehended within a short time after the commission of the offense and is returned to the scene of the crime for on-the-spot identification or when identification is made shortly after the commission of the crime. State v. Dauzat, 364 So.2d 1000 (La.1978); State v. Patrick, 31,380 (La.App.2d Cir.10/28/98), 721 *613 So.2d 94, writ denied, 98-2957 (La.03/19/99), 739 So.2d 780; State v. Cotton, 511 So.2d 1207 (La.App. 2d Cir. 1987). Such prompt identification, under appropriate circumstances, promotes accuracy as well as expediting the release of innocent suspects. State v. Williams, 420 So.2d 1116 (La.1982); State v. Bickham, 404 So.2d 929 (La. 1981); State v. Patrick, supra; State v. Cotton, supra.

Considering both the evidence presented at the hearing on the motion to suppress and at trial, we find that the trial court did not err in denying the defendant's motion to suppress Ms. Netter's identification of defendant. Even if suggestive and not favored by the law, this one-on-one identification was permissible as justified by the overall circumstances. See State v. Sewell, 35,549 (La.App.2d Cir.02/27/02), 811 So.2d 140, writ denied, 02-1098 (La.03/21/03), 840 So.2d 535; State v. Barber, supra. Particularly, defendant was identified shortly after the commission of the crime. Such prompt identification, under appropriate circumstances, promotes accuracy and expedites the release of innocent suspects. Id.
Furthermore, the trial court properly considered factors set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), in concluding that the identification was reliable. First, the opportunity of the witness, Ms. Netter, to view the perpetrator at the time of the crime was ample. She viewed defendant's face three times, from both sides and from the front, and each time the witness was just a few yards away from defendant. Second, Ms. Netter's degree of attention was great, as evidenced by the fact that she remained on the telephone with the 911 operator and described the entire incident as it transpired. Third, the accuracy of the witness's prior description of the criminal was good. Ms. Netter described to the 911 operator a black man dressed in gray, driving a maroon vehicle. Fourth, the level of certainty demonstrated at the confrontation was great. Ms. Netter testified that she was "pretty" certain of her identification at the confrontationa fact corroborated by the testimony given by Detective Smith. Fifth, the length of time between the crime and the confrontation was short. After consideration of these factors, the record shows that any suggestiveness of the identification procedure used was outweighed by the overall reliability of the identification. Under these circumstances, there was no substantial likelihood of misidentification. See State v. Sewell, supra; State v. Barber, supra. Thus, the out-of-court identification was properly admissible to enhance Ms. Netter's credibility. It did not thereafter taint Ms. Netter's in-court identification, which was independently made.
Adjudication of Defendant as a Third Felony Offender
After defendant was charged as a fourth felony habitual offender on December 10, 2001, he entered a plea of not guilty at a hearing held on June 10, 2002. Defendant was represented by court-appointed attorney Mary Winchell. The state presented evidence, and the matter was left open for an objection by the defense.
Ms. Winchell noted that the defense did not have any objections to the introduction of the state's exhibits. The state presented the testimony of Sergeant Owen McDonnell of the Caddo Parish Sheriff's Office, an expert in fingerprint identification analysis. Defendant was fingerprinted in open court and his fingerprints were introduced into evidence (Exhibit S-10). Sergeant McDonnell compared defendant's fingerprints on Exhibit S-10 to the fingerprints contained on S-1 (pen pack), S-2 *614 (the bill of information for felony theft), S-4 (the bill of information for simple escape), and S-6 (the bill of information for armed robbery) and determined them to be a match.
Also during the habitual offender proceeding, Agent Bob Lee, a supervisor with the state probation and parole office, made an in-court identification of defendant as the same person he supervised during his "good time" (diminution of sentence) parole from his armed robbery and simple escape convictions. Agent Lee stated that defendant's parole did not expire until May 3, 2002. In fact, defendant was still under parole supervision at the time he committed the instant offense.
At a hearing held on August 2, 2002, the state and the defense acknowledged that two of defendant's predicate convictions, simple escape and armed robbery, occurred on the same day, and agreed that it would be improper to adjudicate defendant to be a fourth felony habitual offender, citing State ex rel. Mims v. Butler, 601 So.2d 649 (La.1992). Therefore, only one of the August 20, 2002, guilty plea convictions was used as a predicate offense. Thereafter, on August 7, 2002, the trial court adjudicated defendant to be a third felony offender.
Defendant argues that the guilty plea transcripts for the predicate offenses did not properly show he was advised of his rights to trial by jury, compulsory process, confrontation, and against self-incrimination as required by Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).
The habitual offender sentencing statute, R.S. 15:529.1, in force at the time of the offense of conviction is applicable to defendant in this case. See State v. Barnes, 02-2059 (La.04/04/03), 845 So.2d 354. The instant offense was committed on June 26, 1999.
La. R.S. 15:529.1(D)(1)(b) provides in pertinent part:
Except as otherwise provided in this Subsection, the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. The presumption of regularity of judgment shall be sufficient to meet the original burden of proof.... A person claiming that a conviction or adjudication of delinquency alleged in the information was obtained in violation of the Constitutions of Louisiana or of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof, by a preponderance of the evidence, on any issue of fact raised by the response. Any challenge to a previous conviction or adjudication of delinquency which is not made before sentence is imposed may not thereafter be raised to attack the sentence.
In the instant case, defendant denied the allegations of the bill of information charging him as a fourth felony habitual offender by entering a plea of not guilty. The burden was then placed on the state to prove the existence of the prior guilty pleas and that defendant was represented by counsel. See State v. Shelton, 621 So.2d 769 (La.1993); State v. Wade, 36,295 (La.App.2d Cir.10/23/02), 832 So.2d 977, writ denied, 02-2875 (La.04/04/03), 840 So.2d 1213. After agreeing that only one of the August 20, 2002, guilty plea convictions was to be used as a predicate offense, the state met its initial burden by introducing evidence of at least two prior guilty plea convictions, which, together with the instant conviction, supported defendant's adjudication as a third felony habitual offender. Certified copies of the bills of information from docket number 136,019 (middle grade theft June 10, 1987) *615 and docket number 148,956 (armed robbery August 20, 2002) were introduced into evidence, and a fingerprint expert confirmed that the fingerprints on the bills belonged to defendant. The state also offered certified copies of the court minutes of the guilty pleas in those two prior felonies. Both sets of court minutes reflected that defendant was represented by counsel when each guilty plea was taken, with the judge acknowledging that the pleas were taken in accordance with Boykin.
Defendant complained in part that "his priors were illegal wherein defendant did not make a knowing and intelligent waiver of his rights." Although the court minutes do not sufficiently demonstrate an explanation and waiver of defendant's constitutional rights, the state met its burden of proof by introducing "perfect" transcripts of the taking of the two guilty pleas in docket number 136,019 (middle grade theft, June 10, 1987) and docket number 148,956 (armed robbery, August 20, 2002). See State v. Shelton, supra. The transcripts introduced reflect colloquies between judge and defendant wherein defendant was informed of and specifically waived his right to trial by jury, his privilege against self-incrimination, and his right to confront (i.e., cross-examine) his accusers. Therefore, the record supports the conclusion that the state proved beyond a reasonable doubt every essential element of the habitual offender bill. See State v. Shelton, supra; State v. Wade, supra.
Denial of Motions for New Trial
Defendant argues that his motion for new trial should have been granted because he received ineffective assistance of counsel from defense attorney Joseph Clark. Defendant asserts that Clark was ineffective for the following reasons:
1. An alleged disparity of the testimony at trial regarding his physical description and clothing, and Clark's failure to procure his arrest photograph and clothing as evidence for trial,
2. A lack of communication with Clark,
3. Clark's failure to adequately investigate his case or interview witnesses,
4. Clark's failure to procure affiant Ronald White's presence at trial, or to move for a recess or continuance when White failed to reappear, and
5. Clark's failure to obtain a five-year sentence in exchange for the dismissal of his civil suit against the City of Shreveport.
The district court minutes reflect that Joseph Clark was appointed to represent defendant as conflict counsel on October 4, 2000, and that Clark represented the defendant during his trial. Motions for new trial were among the numerous pro se pleadings filed by defendant. Thereafter, on March 11, 2002, Clark filed a motion to be relieved as counsel, which motion was argued and granted. Attorney Mary Winchell was subsequently appointed to represent defendant. Hearings were held on three different dates on defendant's claim that he received ineffective assistance of counsel.
At one of these hearings, Clark was extensively questioned by defendant, who was representing himself at the time. It was noted that Clark was defendant's fourth or fifth court-appointed counsel. Evidence was developed regarding Clark's preparation for trial and trial performance.
Defendant introduced into evidence the computer-generated professional visitation log from Caddo Correctional Center (hereinafter referred to as "CCC"), and/or the Caddo Parish Jail, which was provided by Sergeant Rick Farris of the Caddo Parish Sheriff's Office. The log showed that from October 1, 2000, through January 26, 2001, Clark made one visit to defendant, on January *616 21, 2001, which visit lasted about an hour and fifteen minutes.
Clark remembered meeting with defendant at the courthouse on the day he was appointed, approximately six months before trial. Clark adamantly denied that the January 21, 2001, meeting was the first meeting he had with defendant. Clark explained on cross-examination that he often signs in to visit with one defendant in the holding area of the courthouse for court appearances, but that he might visit with numerous defendants while in that area. Clark stated that he had numerous telephone conversations with defendant. Clark stated that his file would not normally contain documentation of those calls, some of which were probably collect calls from CCC. Clark did not recall sending any legal correspondence to defendant, but acknowledged receiving numerous pieces of mail from him.
Clark explained that his investigation consisted of contacting all of defendant's prior attorneys, getting the file, going through all of the discovery materials and discussing the case with defendant. Clark also stated that he does not have an investigator on payroll, and did not hire experts to reconstruct or photograph the crime scene because this type of case did not require such an expert.
Defendant presented a letter to Clark, written by defendant on October 16, 2000, in which defendant asserted that he asked Clark to subpoena witnesses. However, the letter, which was read into the record, mentioned nothing of subpoenas or witnesses. Defendant also presented a letter to Clark dated January 9, 2001, which indicated in a "roundabout" way that defendant had witnesses. Clark noted that the letter did not name any witnesses nor did it give any relevant contact information to subpoena witnesses. Clark explained that he never received a list of persons to contact from defendant. Clark acknowledged that he did not interview Ms. Netter or the arresting officers prior to trial, but noted that his cross-examination exposed all relevant facts beneficial to defendant. Defendant also questioned Clark about the affidavit signed by Sam Love. Clark stated that the affidavit surfaced approximately two or three days before trial. Clark did not recall trying to locate the affiant because he did not have any contact information.
As to defendant's clothing and booking photograph, Clark noted that he chose to emphasize Ms. Netter's failure to observe defendant's facial scarsomething he considered a glaring deficiency. Clark stated that this was a tactical decision which would not have affected the outcome of defendant's case.
Clark acknowledged that he did not object during the prosecutor's closing argument to the statement that defendant's facial scar might have appeared after the crime.[4] Clark explained that this was never raised prior to closing argument and objections during closing arguments can sometimes backfire.
Defendant's brother, Wallace Tilmon, related that he was part of a three-way telephone conversation with defendant and attorney Herschel Richard. It was Wallace's understanding that if defendant dismissed his complaint against Cynthia King (one of his former defense attorneys, who was represented by Richard with reference to the complaint), "negotiations" would then include a five-year sentence for defendant.
*617 Herschel Richard testified stated that he represented Ms. King regarding the disciplinary complaint filed against her by defendant. Richard denied that any conversation ever occurred between him and Clark regarding the possibility of defendant being offered a five-year hard labor sentence by the state in exchange for defendant's dismissal of the complaint against Ms. King. Clark also denied ever speaking to Ms. King regarding defendant.
The defense presented the testimony of attorney Stacey Williams, who represented the City of Shreveport in a civil lawsuit filed by defendant arising out of the events surrounding the instant conviction. Ms. Williams denied ever having any conversations with Clark about the state's evidence in the criminal case or ever telling Clark that defendant could receive a five-year hard labor sentence if he dismissed the civil suit against the city. Ms. Williams further denied ever meeting with prosecutors regarding the criminal case. Clark likewise denied ever having conversations with Ms. Williams about anything other than defendant's sentencing date.
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. A motion for new trial is, however, an accepted vehicle to raise such a claim. La. C. Cr. P. art. 851(1). When the record is sufficient, this court may resolve this issue (ineffective assistance of counsel) on direct appeal in the interest of judicial economy. State v. Smith, 98-1417 (La.06/29/01), 793 So.2d 1199, cert. denied, 535 U.S. 937, 122 S.Ct. 1317, 152 L.Ed.2d 226 (2002); State v. Elzie, 37,920 (La.App.2d Cir.01/28/04), 865 So.2d 248.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The assessment of an attorney's performance requires that his conduct be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions and trial strategy. There is a strong presumption that trial counsel has exercised reasonable professional judgment. State v. Moore, 575 So.2d 928 (La.App. 2d Cir.1991), cert. denied, 537 U.S. 1236, 123 S.Ct. 1360, 155 L.Ed.2d 202 (2003).
Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland v. Washington, supra.
In the instant case, this lengthy record on the new trial motion is indeed sufficient to resolve the issue of ineffective assistance of counsel on direct appeal.
The facts presented at the various hearings regarding defendant's allegations of ineffective assistance of counsel clearly support the trial court's denial of the motions for new trial. It is evident from the record that many of defendant's factual representations are inaccurate and/or distorted. Despite the many witnesses presented and the evidence produced by defendant at these hearings, he has failed to demonstrate that Clark's representation fell below the standard of reasonableness and competency as required *618 by prevailing professional standards demanded for attorneys in criminal cases. Considering the facts and circumstances of the case, the record does not support defendant's claim that Clark failed either to adequately communicate with him or to prepare for trial. Furthermore, Clark's decisions regarding the interviewing and examination of witnesses do not constitute ineffective assistance of counsel. See State v. Morrison, 32,123 (La.App.2d Cir.07/22/99), 743 So.2d 232, writ denied, 99-3514 (La.05/26/00), 762 So.2d 1103. This court must give great deference to trial counsel's judgment. State v. Moore, supra.[5]
We note that even if counsel was found to have committed any of the alleged errors, the record does not support the conclusion that, but for those errors, there is a reasonable probability the outcome of the trial would have been different. Strickland v. Washington, supra; State v. Pratt, 26,862 (La.App.2d Cir.04/05/95), 653 So.2d 174, writ denied, 95-1398 (La.11/03/95), 662 So.2d 9, grant of habeas corpus rev'd., 142 F.3d 226 (5th Cir.La.1998).

Conclusions
For the foregoing reasons, defendant's conviction and sentence are affirmed.

APPLICATION FOR REHEARING
Before BROWN, GASKINS, PEATROSS, DREW, and MOORE, JJ.
Rehearing denied.
NOTES
[1] Ms. Netter believed that Sergeant Reich was the officer who took her to make the identification. Sergeant Reich had no recollection of being involved with the identification process.
[2] Detective Smith did not remember whether he was present during the identification process. He did remember that, while writing the report, Ms. Netter advised him that she was positive that the man in custody was the same man she saw at the Duck Pond.
[3] White, who had been subpoenaed and sworn, could not be found the day he was scheduled to testify.
[4] In support of his new trial motion, Defendant presented the testimony of his mother, Lola Tilmon, to document the fact that defendant received burns, including some on the right side of his face, in September 1958 when he was five years old.
[5] Defendant sought the production of Clark's file to support his ineffective representation claim. In State v. Hunter, 614 So.2d 332 (La.App. 4th Cir.1993), appeal after remand, 93-1681 (La.App. 4th Cir.12/15/94), 648 So.2d 1025, writ denied, 95-0682 (La.09/01/95), 658 So.2d 1259, the court of appeal found that the defendant's claims raisedserious questions about the effectiveness of his counsel and the possibility of prejudice to the defendant (emphasis added), and determined that the trial court should have, at the very least, conducted an in-camera inspection of defense counsel's file to determine whether there was anything pertinent to the claim of ineffective assistance of counsel. State v. Hunter, supra, is easily distinguishable from the instant case in that this record shows no serious questions about Clark's effectiveness as counsel in his representation of defendant. Furthermore, it is clear from the testimony that the file, which was in storage, would have added little if any, support to defendant's claims.