966 So.2d 139 (2007)
STATE of Louisiana, Appellee
v.
Michael Anthony ELLIS, Jr., Appellant.
No. 42,520-KA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 2007.
*142 Louisiana Appellate Project, by W. Jarred Franklin, Michael Anthony Ellis, Jr., Metairie, for Appellant.
Paul J. Carmouche, District Attorney, John F. McWilliams, Jr., Lea R. Hall, Jr., Assistant District Attorneys, for Appellee.
Before WILLIAMS, STEWART and CARAWAY, JJ.
STEWART, J.
The defendant, Michael Ellis, was convicted of two counts of Armed Robbery with the use of a fire arm. After being adjudicated as a second felony offender, he was sentenced to 198 years at hard labor without benefit of probation, suspension of sentence or parole on each count. The defendant now appeals. The defendant's convictions and sentences are affirmed.

FACTS
On February 22, 2004, around 4:00 a.m., taxi driver Catherine Jones was picking up fares at the Hollywood Casino in Shreveport. Outside of the casino, Ms. Jones made eye contact with an individual sitting on a bench. Ms. Jones believed the person, later identified as the defendant, Michael Anthony Ellis, Jr., needed a ride. Ellis approached the taxi and got into the back passenger seat. The defendant informed Ms. Jones that his destination was the Villa Norte Apartments. Ms. Jones was familiar with the complex, and drove in that direction. During the ride, Ms. Jones noted that she felt comfortable with the defendant who was polite and well-mannered. Ms. Jones even took a cell phone call during the ride.
Once they arrived at the apartment complex, the defendant directed Ms. Jones to drive towards the back of the complex to an area that was somewhat remote and dimly lit. Ms. Jones stopped where instructed and told the defendant the amount of his fare. The defendant asked if Ms. Jones had change, and as she was handing the change to the backseat of the car, the defendant told her to look towards the back seat. Near the floorboard of the car, the defendant was holding a gun. The defendant demanded money, and after Ms. Jones gave him what was in her shirt pocket, the defendant demanded more. As Ms. Jones turned her head, she felt the gun touching her face. Ms. Jones did gather some additional money from a pouch and gave it to the defendant. To prove she did not have any more money, Ms. Jones showed the defendant a voucher she had for some of her earnings. Ms. Jones invited the defendant to take the voucher, but he did not. The defendant demanded Ms. Jones' cell phone which she refused to give to him. The defendant exited the car and walked a few steps before turning to wave and smile at Ms. *143 Jones. Ms. Jones was also threatened by the defendant to leave the area and not return or he would "get her." Ms. Jones immediately left the complex and returned to her company headquarters which was nearby. That night, Ms. Jones was interviewed by police.
The next day, another robbery was committed in similar fashion. On February 23, 2004, Voncille Francois, a taxi driver, was dispatched to pick up a fare at the Royal Inn on North Market Street in Shreveport. When she arrived, Ms. Francois did not notice anyone outside of the hotel, but did see someone come from the opposite direction of the hotel. The person later identified as the defendant entered the taxi, and told Ms. Francois that he needed to be taken to the Ville Norte apartments. When they arrived at the apartment complex, the defendant directed Ms. Francois to the back of the complex. When she stopped the taxi, the defendant told Ms. Francois to look to the back seat of the vehicle, and he brandished a weapon. The defendant demanded Francois' money and she complied. Ms. Francois only had $20.00 with her at the time. The defendant demanded more, but left the taxi after Ms. Francois indicated she did not have any more money with her. After the defendant left the taxi, he ran in an unknown direction.
Ms. Francois went to the front of the complex where police were dispatched in response to her call. A K-9 unit responded to the scene, and the dog was able to track a scent. The scent led to the Yorkshire Apartments on North Hearne, a short distance from where the crime occurred. As the K-9 and his handler, Corporal Cain, arrived at the Yorkshire Apartments, Corporal Cain was informed that the call requesting the taxi had come from apartment 1702 at the Yorkshire Apartments. The building was surrounded, and as officers attempted to enter the front door of the apartment, officers at the back of the building saw the window blinds moving and a leg appeared out of the window.
When a light was placed on the window, the person went back into the apartment. At the front door, the owner of the apartment allowed the officers into the apartment, and the defendant was seen inside. The officers apprehended the defendant and the apartment owner gave permission for the officers to search the apartment. In the defendant's girlfriend's room, officers found a shirt matching the description of the one worn by the perpetrator of the armed robbery and a gun. The defendant was arrested and a subsequent investigation linked both robberies to the defendant.

DISCUSSION
Sufficiency of Evidence
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle *144 to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La. App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
To convict a defendant of armed robbery, the state is required to prove: (1) a taking (2) of anything of value (3) from a person or in the immediate control of another (4) by the use of force or intimidation (5) while armed with a dangerous weapon. La. R.S. 14:64; State v. Jeselink, 35,189 (La.App. 2d Cir.11/2/01), 799 So.2d 684. A dangerous weapon is any instrumentality which, in the manner used, is calculated or likely to produce death or great bodily harm. La. R.S. 14:2(3). This court has viewed the crime of armed robbery with the use of a firearm under La. R.S. 14:64.3 as a more serious form of armed robbery for which the penalty range is effectively 15 to 104 years. State v. Smith, 40,894 (La.App. 2d Cir.7/26/06), 936 So.2d 255, writ denied, 2006-2113 (La.3/30/07), 953 So.2d 60; State v. White, 39,634 (La.App. 2d Cir.6/16/05), 907 So.2d 180. This court has also held that the crime of armed robbery with the use of a firearm must be charged by bill of information and proven to the jury. State v. Odell, 37,194 (La.App. 2d Cir.6/5/03), 850 So.2d 749. See State v. Jefferson, 40439 (La.App. 2d Cir.1/27/06), 920 So.2d 984 and State v. Adkins, 39,724 (La.App. 2d Cir.6/29/05), 907 So.2d 232, footnote 1.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Burd, 40,480 (La.App. 2d Cir.1/27/06), 921 So.2d 219, writ denied, XXXX-XXXX (La.11/9/06), 941 So.2d 35; State v. Jones, 31,613 (La.App. 2d Cir.4/1/99), 733 So.2d 127, writ denied, 99-1185 (La.10/1/99), 748 So.2d 434; State v. White, 28,095 (La.App. 2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
In cases involving a defendant's claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Powell, 27,959 (La.App. 2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
Catherine Jones testified she was driving a taxi on February 22, 2004 sometime around 4:00 a.m. Ms. Jones was stationed outside of the Hollywood casino where she saw a young man, identified in court as the defendant, dressed in all black sitting on a bench outside of the casino. Ms. Jones stated she made eye contact with the individual and understood he needed a taxi. The defendant got into the taxi, and requested Ms. Jones take him to the Villa Norte Apartments. Ms. Jones was familiar with the apartments located on Fullerton Street near Hearne Avenue. Ms. Jones recalled that while en route to the defendant's destination, she felt comfortable with him in the vehicle. Ms. Jones stated she took a telephone call on her cell phone as they traveled.
Once they arrived at the apartment complex, the defendant directed Ms. Jones to drive to the back of the complex. According *145 to Ms. Jones, this area was dimly lit and somewhat secluded. Ms. Jones stopped the car, turned on the inside lights of the vehicle and informed the defendant that his fare was $5.00. The defendant asked if she had change for a twenty-dollar bill available. Ms. Jones did have the change, and as she turned to give the defendant the change, he told her to look in his direction. Ms. Jones did look and saw the defendant holding a black gun down near the floorboard of the car.
Ms. Jones then handed the defendant the money she had in available in her shirt pocket. The defendant told Ms. Jones that the money, approximately twenty dollars, was not enough. The defendant then slid across the seat to a position between the front bucket seats. The defendant placed the gun next to Ms. Jones' face, and demanded additional money. Ms. Jones did have money stashed in a pouch in the door of the vehicle. Ms. Jones gave that money to the defendant and informed him that she did not have any more money. Fearful that the defendant would not be satisfied, Ms. Jones attempted to prove to the defendant that she did not have any other money by showing him a voucher she was carrying in the vehicle. In total, Ms. Jones gave the defendant approximately $109.00.
Ms. Jones stated the defendant demanded her cell phone; however, she refused. The defendant then slid across the seat and exited the taxi. After walking about 10 steps, the defendant turned, waved, and smiled at Ms. Jones. Ms. Jones testified she did not remember exactly when, but knew the defendant told her something to the effect of "get out of here and don't come back or I will get you." As the defendant walked away, Ms. Jones raced out of the complex. Driving through the complex, Ms. Jones was fearful that the defendant might emerge from the shadows of one of the buildings. Ms. Jones then contacted the dispatcher of the taxi company, informing them of the robbery and the fact that she was leaving the area. Later that morning, a police officer took Ms. Jones' initial statement regarding the incident. Ms. Jones made a positive identification of the defendant in court as well as confirmed that she had picked the defendant out in a photographic lineup presented to her during the investigation phase of the crime. Ms. Jones stated that she was 100 percent sure that the defendant was the person who robbed her.
Detective Lane Smith (Det. Smith) of the Shreveport Police Department robbery homicide division testified he was assigned to investigate Ms. Jones' robbery. After interviewing Ms. Jones, Det. Smith reviewed the arrest report of another crime, and found both offenses to be "exceptionally similar." The offenses occurred within one day of each other, occurred at the same location, and the description of the suspect was similar. The defendant had been arrested in the second offense. Based on this information, Det. Smith prepared a six-photo lineup for Ms. Jones to view. Ms. Jones viewed the lineup, and "without hesitation" picked photograph six, which was a picture of the defendant. Ms. Jones told Det. Smith she was positive of her identification.
As its next witness, the state called Ms. Voncille Francois, the victim of the February 23, 2004, robbery. At approximately 2:30 a.m., Ms. Francois was dispatched to Royal Inn on North Market. Ms. Francois was to pick someone up from the lobby of the Inn, but when she arrived, the defendant came running from across the street. The defendant told Ms. Francois he was the one she was to pick up. Once in the taxi, the defendant directed Ms. Francois to the Villa Norte apartments on Fullerton. During the ride, Ms. Francois *146 and the defendant talked, and the defendant told her he was from California. According to Ms. Francois, the defendant was a pleasant, very nice young gentleman.
At the apartment complex, the defendant directed Ms. Francois to drive to the back of the complex or the "end of the apartments." The defendant requested Ms. Francois turn the inside vehicle light on. Ms. Francois turned her head toward the defendant and he moved to the seat behind her and showed her "the pistol" that he was holding in his lap. Ms. Francois was driving a van at the time, and the lighting enabled her to see everything including the defendant's face. Once the defendant showed the gun, he said "Now, I want all your money, and I want it right now. I want it all. I mean, I want all your valuables."
Once Ms. Francois was threatened, she complied with the defendant's demands by giving him all of the money she had at the time, twenty dollars in one dollar bills. Ms. Francois also told the defendant he could take a "little, cheap ring" she was wearing but that was all she had. She also invited the defendant to examine the glove compartment of the vehicle. Once the defendant received the money, he got out of the van, closed the door, and ran away. After the defendant left the vehicle, Ms. Francois contacted her dispatcher that she had been robbed by the person she picked up at the Royal Inn. The dispatcher notified police. Ms. Francois sat in front of the apartment complex awaiting the arrival of the police.
Ms. Francois was able to recall that the defendant was wearing a "big, old, bright red, you know, jersey, Fubu shirt." State's exhibit 3, a red FUBU jersey, was identified by the witness as one that looked like the shirt the defendant was wearing at the time of the robbery. Ms. Francois also identified state's exhibit 2, a firearm, as one resembling the weapon held by the defendant during the robbery. During her testimony, Ms. Francois positively identified the defendant as the perpetrator of the armed robbery. In explaining why she had not identified the defendant on the night of the robbery Ms. Francois stated, "I was afraid, and I kind of didn't want to get involved. I didn't know how far this was going to go." "And I'm on the street, and I know later on, I had to come on (sic) to grips that I had to go on and make an identification of this person and get it over with, because he would kill somebody." In court, Ms. Francois stated she was one hundred percent positive that the defendant committed the crime.
In recalling other details of the night of the incident, Ms. Francois stated that it was raining that night, and the rain had slowed to a mist at the time of the robbery. Ms. Francois also testified that the call for the pick up at the Royal Inn had come from somewhere other than the Royal Inn as she later determined. As a part of its business practice, the taxi company utilizes caller-ID, and was able to provide information as to where the call originated. This information regarding "bad calls" is usually shared with the drivers, but Ms. Francois had not been informed that this was a bad call. Ms. Francois went back to work after making her initial report to police, and was called approximately two hours later to identify the defendant.
On cross examination, Ms. Francois noted that she had gone to the Yorkshire apartment complex where the call for the taxi originated from. Ms. Francois told police she was unable to identify the defendant because, "I was, but I didn't tell them that night, because I really didn't want to get involved, you know." Ms. Francois later reconsidered her position, "But *147 after I thought about it later, it would hurt somebody else." Fear for her own safety also prevented the witness from making the identification on the night of the robbery.
Corporal Clint Cain, a K-9 officer with the Shreveport Police Department, testified regarding his involvement in the investigation of the robbery. Corporal Cain testified that he works with his dog Berry. Berry is a highly decorated police dog who has won numerous national awards. The night of the robbery, Corporal Cain and Berry arrived on the scene and began tracking the defendant from the area where he was last seen by the victim. After traveling through a fence at the back of the apartment complex, Berry followed the scent and led Corporal Cain over a dirt road, a drainage ditch, and some other areas before arriving at the Yorkshire apartments. As they arrived at the apartment complex, still following the scent, Corporal Cain received information that the call requesting the taxi to the Royal Inn had come from apartment 1702 in the Yorkshire complex. At that time, they were very close to that building. Corporal Cain requested the building be surrounded, with officers being stationed at the front and rear of the building.
As they were approaching the front of the building, officers informed Corporal Cain that someone was attempting to leave via a back window. Corporal Cain was able to see inside the apartment, and saw the defendant running from a bedroom into a hallway. The defendant was commanded to "prone out" or lie flat on his stomach with his palms up. Patrol officers moved in to secure the defendant. Permission to search the apartment was granted by the resident.
Upon searching the room from where the defendant had run, Corporal Cain discovered a red jacket and a gun with an obliterated serial number under the bed. Corporal Cain noted that the only difference with S-3 was that it was wet when he first recovered it from the bedroom. Pictures of the scene were taken and identified in court as an accurate representation of the scene.
Sergeant T.D. Thompson was the officer who knocked on the door of the apartment where the defendant was found after the robbery. According to Sgt. Thompson, after he knocked twice, the black female, later identified as Dorothy Ford opened the door. Inside of the apartment, the defendant could be seen moving around. After the defendant was secured, Sgt. Thompson found eighteen one-dollar bills on the defendant.
Sergeant Mike Sanders of the Shreveport Police Department testified he participated in the search for the defendant after the robbery. Sgt. Sanders was stationed at the back of the apartment building when he observed a leg coming out of the window. Sgt. Sanders hollered "police" and "put the gun down" as they had been informed the suspect had used a gun during the crime. The person went back into the apartment. Sgt. Sanders then went inside the apartment and participated in the search which recovered evidence in the bedroom used by the defendant.
Ms. Dorothy Ford was living in Yorkshire apartment 1702 with her daughter, Tykeisha Jackson. Once police knocked, Ms. Ford opened the door and was asked by an officer to step outside. Ms. Ford eventually gave permission for the officers to search her apartment. Ms. Ford recalled that the defendant was not at the apartment when she went to bed sometime between 10:00 and 11:00 p.m. Ms. Ford indicated it was not uncommon for her daughter and the defendant to go to her daughter's room after she was asleep. After Ms. Ford's testimony, the *148 state rested its case. The defense also rested.
Considering the evidence in the light most favorable to the state, the burden of proof has been met. The state, by testimony of the victims, was able to prove that the defendant while armed with a gun demanded and took money from both victims. Each victim testified that the defendant specifically brought her attention to the weapon prior to demanding money. Each victim recalled that she was able to clearly see the defendant's face. Fearing harm from the defendant (force or intimidation), each victim acquiesced to the defendant's demands and surrendered (taking) money (something of value) to the defendant. There was sufficient evidence presented for the jury to conclude that the defendant had committed the crime as each victim positively identified the defendant in court as the perpetrator of the offense. The testimony of each witness as to the identity of her assailant was sufficient to prove this was not a case of misidentification.
The defendant was charged with the more serious armed robbery with a firearm under La. R.S. 14:64.3, and the state did present sufficient testimony of both victims to establish that the defendant was in fact armed with a firearm during the commission of the robberies. The victim of the second robbery, Ms. Francois, was able to identify state's exhibit 3 as a weapon that resembled the one the defendant held at the time he demanded her money. Additionally, the weapon was recovered shortly after the robbery in a room from which officers saw the defendant run immediately before he was captured. This testimony is sufficient to establish the necessary elements of this offense. Therefore, this argument is without merit.
Prejudicial Testimony-Prior Bad Acts
The defendant alleges the trial judge failed to declare a mandatory mistrial as required in accordance with La. C. Cr. P. art. 770, after statements were made by a detective in reference to the defendant's prior arrests.
The state counters that the statements made by the detective were not comments of a "court official" as is required under the provisions of La. C. Cr. P. art. 770 for the trial court to declare a mandatory mistrial.
La. C. Cr. P. art. 770 provides in pertinent part, upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
A law enforcement officer's unsolicited, unresponsive reference to another crime by the defendant generally is not the comment of a "court official" under provisions of rule requiring mistrial for prejudicial remarks made during trial by court officials. State v. Kemp, 39,358 (La.App. 2d Cir.3/11/05) 896 So.2d 349, writ denied, XXXX-XXXX (La.12/9/05), 916 So.2d 1052; State v. Scott, 34,949 (La.App. 2d Cir.1/25/02), 823 So.2d 960, writ denied, XXXX-XXXX (La.5/16/03), 843 So.2d 1122.
La. C. Cr. P. art. 771 provides in the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

*149 (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Mistrial is a drastic remedy and, unless mandatory, is committed to the sound discretion of the trial judge. State v. Keys, 29,369, 29,370 (La.App. 2d Cir.5/7/97), 694 So.2d 1107, writ denied, XXXX-XXXX (La.10/31/97), 703 So.2d 21, writ denied, XXXX-XXXX (La.10/31/97), 703 So.2d 21. Denial of mistrial motion, under articles providing for admonishment will not be disturbed on appeal absent abuse of the trial court's discretion. State v. Ingram, 29,172 (La.App. 2d Cir.1/24/97), 688 So.2d 657; writ denied, XXXX-XXXX (La.9/5/97), 700 So.2d 505.
During his testimony, Det. Smith said he used "prior arrest photos" of the defendant to prepare a six-photo lineup for the victim Ms. Jones to view. When asked how the lineup was prepared, Det. Smith stated, "Yes, it's a computer system that consists of all prior arrest photos." Defense counsel then objected and the jury was removed. Defense counsel then moved for a mistrial based on two mentions of prior arrests.
Defense counsel argued that was a mention of the prior offenses of Mr. Ellis, which were inadmissible in this trial. In response, the state argued that there were two cases being tried and Det. Smith's responses regarding the prior arrest were referencing the second robbery for which the defendant was on trial. The trial court ruled that because there were two counts being tried, the context of the statement was that the photographic lineup was compiled and shown to Ms. Jones after the defendant had been arrested for the robbery of Voncille Francois and thus the inference that the photo included in the lineup had been obtained when the defendant was arrested for the Francois robbery.
The trial judge also noted that he believed the defense objection, while properly raised, may have drawn more attention to the issue than anything else. The trial judge ruled that the statement was inadvertent and not prejudicial to the defendant. After making this ruling, the judge asked if the defense would like the jury to be admonished regarding the statement. The defense requested that the admonishment be made. The judge then cautioned Det. Smith not to mention anything further regarding a prior arrest of the defendant. In an unrecorded bench conference, the parties agreed that the court would instruct the jury to disregard the last answer given by Det. Smith. The defense agreed to the admonishment being presented in that manner. The jury was so admonished.
We find that the trial court did not err in its ruling. Initially, it is noted that the detective would not be considered a court official; thus, the trial judge would not be required to declare a mandatory mistrial in this instance. Even considering the granting of a permissive mistrial in accordance with La. C. Cr. P. art. 771, the statement made by the detective in response to questions by the state was not one which would deprive the defendant of an opportunity to receive a fair trial. The admonishment was sufficient to cure any potential prejudice to the defendant. As a *150 discretionary mistrial, the trial court correctly considered the situation and presented the correct ruling based upon the facts of this incident. Because the defendant was being tried for two crimes, and Det. Smith had already testified that the defendant had been arrested for one of the crimes, the jury certainly could have inferred that the detective was referring to a photograph from the defendant's most recent arrest for the instant crime.
This assignment of error is without merit.
Mental Competence of Defendant
The defendant alleges that he was mentally incompetent at the time of trial and that the trial court erred when it concluded that the defendant was competent to be sentenced. Additionally, the defendant alleges ineffective assistance of counsel in that trial counsel failed to request a sanity commission until after the defendant's trial but prior to sentencing.
The state alleges that the trial court did not abuse its discretion in finding the defendant competent to proceed after reviewing the reports presented by members of the sanity commission. Additionally, the state contends that defendant failed to show that trial counsel committed any error or that his performance was deficient.
While a trial court may receive expert medical testimony on point, the ultimate decision of competency to stand trial is for the court alone, and the court will be reversed only if it is clearly erroneous. State v. Reese, 34,275 (La.App. 2d Cir.12/20/00), 774 So.2d 1164.
Because Louisiana law presumes sanity, the defendant faces the burden of establishing his incapacity. State v. Lott, 27,849 (La.App. 2d Cir.4/3/96), 671 So.2d 1182. Moreover, the defendant has the burden of proving his incapacity to either understand the proceedings against him or assist in his defense because of a mental disease or defect. La. C. Cr. P. art. 641-649; State v. Hamilton, 373 So.2d 179 (La.1979).
Prior to being transported to Feliciana Forensic Facility, Ellis was examined by Dr. Charles Vosburg, a consulting psychologist, to the facility and he opined that Ellis was feigning mental illness and there was "no need for further psychiatric treatment." On December 12, 2005, the court appointed Dr. Charles Armstead to the sanity commission to take the place of Dr. Richard Williams. After noting that the results reached by the various doctors was inconsistent, the court appointed Dr. Webb Sentell, a psychologist, to examine him. On December 4, 2006, the trial court held a sanity hearing and concluded, based on Dr. Sentell's report, Ellis was competent to proceed.
We find no error in the determination as to the defendant's competency by the trial judge. In weighing the varying reports, the trial court had to make a decision as to the issue of mental competence. There has been no showing of an abuse of discretion.
Ineffective Assistance of Counsel
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for postconviction relief ("PCR") in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Williams, 33,581 (La.App. 2d Cir.6/21/00), 764 So.2d 1164. A motion for new trial is also an accepted vehicle by which to raise such a claim. Id. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 *151 (La.1982); State v. Willars, 27,394 (La. App. 2d Cir.9/27/95), 661 So.2d 673.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland, supra. The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Moore, 575 So.2d 928 (La.App. 2d Cir. 1991). Also State v. Tilmon, 38,003 (La. App. 2d Cir.04/14/04), 870 So.2d 607, writ denied, 2004-2011 (La.12/17/04), 888 So.2d 866.
Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Pratt, 26,862 (La.App. 2d Cir. 4/5/95), 653 So.2d 174, writ denied, 95-1398 (La.11/3/95), 662 So.2d 9. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. Strickland, supra; State v. Jordan, 35,643 (La.App. 2d Cir.4/3/02), 813 So.2d 1123, writ denied, XXXX-XXXX (La.5/30/03), 845 So.2d 1067.
La. C. Cr. P. art. 643 provides that "[t]he court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed." Reasonable grounds consist of objectively considered information which raises a reasonable doubt about defendant's competency, that the defendant can neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense. State v. Martin, XXXX-XXXX (La.9/22/00), 769 So.2d 1168, quoting Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir.1980); State v. Hunt, 34,945 (La.App. 2d Cir.9/26/01), 797 So.2d 138.
In this instance, defense counsel filed a motion requesting a sanity commission after the defendant had been tried and adjudicated as a second felony offender. Prior to sentencing, the motion was filed. A sanity commission was appointed and an initial determination was made that the defendant was incompetent and could not proceed at that point. The defendant was ordered to Feliciana Forensic Facility where he was to be housed and treated. A subsequent evaluation of the defendant *152 was performed, and the doctors issued varying opinions as to whether the defendant was competent to proceed and whether the defendant was malingering. After considering the reports of the doctors, the trial judge determined that the defendant was now competent to proceed. Several motions for new trial were filed by the defendant and denied by the trial judge. The defendant was ultimately sentenced in the matter.
We also find no merit in the defendant's ineffective assistance of counsel argument. It was first presented to the trial court by way of a motion for new trial may be decided on the record before this court. Defense counsel alleges he should have recognized the defendant was self-mutilating and thus potentially incompetent to proceed. The trial judge disagreed with this argument. We find nothing in the record that supports the assertion that defense counsel noticed or should have noticed any behavior demonstrating of a lack of capacity or competence on the part of the defendant. Therefore, we reject the claim of ineffective assistance of counsel because the defendant has failed to establish that it was both a deficient performance on the part of trial defense counsel not to conduct a sanity hearing for the defendant, and that this failure prejudiced the defendant. Based on the information adduced during the hearing on the motion for new trial, there was no clear evidence presented that trial counsel failed to notice which would have indicated that the defendant was incompetent to proceed. Parties involved in the trial noticed that the defendant exhibited no apparent signs of mental illness. Defense counsel admits that the defendant was able to assist him during the proceedings. Thus, the only tangible evidence of defendant's mental illness was the open sores on his arms. The sores certainly could have been attributed to other causes besides self-mutilation.
Consequently, we find that the defendant fails to show that trial counsel's performance was deficient or that the defendant was prejudiced by the error. This assignment is meritless.
Excessive Sentence
The defendant argues that the trial judge failed to adequately consider several factors when determining the his sentences. According to the defendant, the trial court failed to consider his age, the small amount of money taken during the robberies, the incompetence of the defendant, and the nature of the defendant's prior convictions. The state presents that the defendant, a second felony offender, is the worst type of offender for whom the maximum sentence is appropriate.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App. 2d Cir.2/28/07), 953 So.2d 890. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La.App. 2d Cir.1/28/04), 865 So.2d 284, writs denied, XXXX-XXXX (La.3/11/05), 896 So.2d 57 and 2004-2380 (La.6/3/05), 903 So.2d 452. The important *153 elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La. 1981); State v. Haley, 38,258 (La.App. 2d Cir.04/22/04), 873 So.2d 747, writ denied, 2004-2606 (La.06/24/05), 904 So.2d 728.
There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App. 2d Cir.3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385.
Second, a sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, XXXX-XXXX (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La. 1992); State v. Robinson, 40,983 (La.App. 2d Cir.1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App. 2d Cir.4/2/97), 691 So.2d 864.
As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Woods, 41,420 (La.App. 2d Cir.11/1/06), 942 So.2d 658; State v. Brisco, 33,179 (La.App.2d Cir.4/5/00), 756 So.2d 644, writ denied, XXXX-XXXX (La.5/25/01), 792 So.2d 749; State v. Grissom, 29,718 (La.App. 2d Cir.8/20/97), 700 So.2d 541.
Considering the defendant's criminal history and the instant offenses, we find that the trial court did not abuse its discretion in sentencing the defendant to the maximum sentence on each count. The court considered the defendant's criminal history which included juvenile offenses committed in California and the defendant's felony offense for drug possession. The court also found that the defendant was a violent offender who would likely commit another crime if not incarcerated. The trial court also considered the reports of the members of the sanity commission in concluding that the defendant would pose a great risk to the community if released from a custodial environment. The trial judge also noted that the defendant had been charged with attempted second degree murder after he allegedly attempted to strangle his cell-mate. The defendant's continued lawless behavior, even while incarcerated for the instant offenses, also factored into the judge's decision to sentence the defendant to the maximum on each count.
There is no showing that the trial court abused its wide discretion in sentencing this defendant. It is not this court's role to determine whether another sentence would be more appropriate, but to determine whether the trial court abused its discretion. In considering this defendant and the charged offenses, these sentences are not a needless infliction of pain and suffering nor do these sentences shock the sense of justice.

CONCLUSION
For the foregoing reasons, we affirm the defendant's convictions and sentences.
AFFIRMED.