996 So.2d 451 (2008)
STATE of Louisiana, Appellee
v.
Terrance D. MITCHELL, Appellant.
No. 43,460-KA.
Court of Appeal of Louisiana, Second Circuit.
September 24, 2008.
*452 Kenota L. Pulliam, for Appellant.
Don M. Burkett, District Attorney, Richard Z. Johnson, Jr., Assistant District Attorney, for Appellee.
Before BROWN, STEWART and GASKINS, JJ.
STEWART, J.
The defendant, Terrance D. Mitchell, was convicted of attempted manslaughter and aggravated criminal damage to property. He was sentenced to three years at hard labor on each count, the sentences to run concurrently. The defendant now appeals, urging four assignments of error.[1] For the reasons that follow, the defendant's conviction and sentence are affirmed.

FACTS
This case arises from a shooting incident in Mansfield, Louisiana, on March 20, 2006. A shot was fired at Derrick Brown ("the victim"). Based on the evidence presented, the shot was fired either by the defendant, Terrance D. Mitchell, or by his brother, Derrick Mitchell ("Derrick").
On May 3, 2006, a bill of information was filed charging the defendant with one count of aggravated criminal damage to property, one count of illegal use of weapons or dangerous instrumentalities, and four counts of aggravated assault with a firearm. On June 28, 2006, the State filed an amended bill of information charging him with one count of attempted second degree murder and one count of aggravated criminal damage to property. After pleading not guilty, the defendant waived trial by jury and proceeded to a bench trial, which took place on November 29, 2006.
The first witness to testify for the State was Alonda Gossett. At the time of the incident, she was standing outside her residence when she saw her next door neighbor, the victim, coming home and being approached by the defendant and Derrick. The defendant and Derrick were already there when he arrived. She heard "fighting words" and heard the victim tell them "to wait until he came back outside." Then she heard glass break, and her mother called her inside. She testified that the victim was standing on his porch when the shot was fired and that she never saw a weapon in his hands, nor did she see who fired the shot. She further testified that the bullet went into her residence where her three-year-old daughter and her mother were located at the time. The bullet went over their heads and allegedly *453 knocked a can of potato chips out of the daughter's hand.
On cross-examination, she stated that the incident occurred at night and reiterated that both the victim and the two brothers were angrily exchanging words. She indicated that while the victim was standing at his door, "like he was unlocking the door," he told the brothers "to wait out there because he had something for them." Shortly afterward, she heard the glass break, but she did not hear a shot.
The next witness to testify was Edna Gossett, who is the mother of Alonda Gossett. At approximately 10 minutes till 10:00 p.m. on the night of the incident, she heard a shot and "saw smoke was in the house." Afterward, she saw a hole in the wall and found a bullet on the floor in the hall. She thought she and her granddaughter would have been hit if she hadn't reached down and kissed her granddaughter when the shot was fired. She indicated that her house was "hooked on together" with the Brown residence.
On cross-examination, she indicated that before the shot was fired she had heard the victim's voice raised in an angry tone, but she did not know who fired the shot.
Next to testify for the state was Donald Mayweather, who is a coach at Mansfield High School. On the day of the incident, he had opened the gym up after school to provide recreation "for guys who are not in school at that time." These were "older guys anywhere from twenty and up." Derrick "got into a little struggling match" with Lavarus Brown, the victim's brother. The altercation was broken up, prompting Mayweather to close the gym and instruct them to go home. He did not hear them say anything to each other as he was closing the gym, nor did he hear the victim, who was present, make any threats toward Derrick.
On cross-examination, he indicated that the victim did not get involved in the altercation. On redirect, he reiterated that the defendant was not involved in the altercation, and further stated that he never heard the victim make any threats toward the defendant.
Lavarus testified next. He testified that the defendant was not present at the gym when he "got in a conflict" with Derrick. He stated that the victim was not involved in the altercation and that he never heard him say anything toward Derrick or have any angry words toward anyone at the gym.
On cross-examination, he indicated that the altercation resulted from an argument about the basketball game and that he didn't think it was serious. He also indicated that he did not say anything to Derrick like "come on over to the projects and we'll finish this," nor did he remember the victim saying anything of that nature.
The State's next witness was Shonda Brown, who is the wife of Johnny Ray Brown and the sister-in-law of L. Brown and the victim. At the time of the incident she was at the house of the victim and Sheree Brown. She testified that she and her husband were sitting on the couch "reading a biblical book" when the victim suddenly entered into the house and a shot came through the window. She further testified that if her husband had not "bent down" to read the book, the shot would have hit him in the head. She did not see who fired the shot.
On cross-examination, she indicated that the window broke as soon as the victim closed the screen door behind him. According to her testimony, the victim was physically inside the house. She had not heard any loud voices outside.
*454 Johnny Ray Brown testified next. He essentially corroborated his wife's testimony. He indicated that before the incident occurred, he heard people talking outside, but did not pay attention to what was going on. He stated that the victim was walking in the door when the shot was fired.
On cross-examination, he stated that he did not hear a shot, but heard glass breaking. When asked if the victim was all the way through the wooden door of the apartment at the time the shot was fired, he stated, "All I can remember is him opening the door and saying John and that's when the glass shattered." When asked if the victim was inside the apartment, he stated that he was coming in, but wasn't all the way in.
The victim was the next witness. He began his testimony by admitting that on November 21, 2006, he went to the district attorney's office to drop the charges against the defendant, even though he did not deny that the incident occurred. When asked why he wanted to drop the charges he stated:
My main purpose of wanting to drop the charges was after I thought about the extent of it, I had thethe thought was that I wasn't one hundred percent sure that he is exactly the person that shot. And when I felt in my heart I wasn't more than a hundred percent sure, my conscience wouldn't let me get a man basically probably thrown away if I wasn't more than a hundred percent sure.
The victim was then asked whether he had told the victim rights advocate in a telephone conversation that the defendant's father had offered him money to drop the charges. After an objection by defense counsel and some discussion, the prosecutor was asked if he was attacking the victim's credibility; he responded:
In case that needs to be attacked, that's exactly what I'm doing, Your Honor.
After a bench conference, the court allowed the question, "but nothing else to be explored along these lines." Defense counsel's motion for a mistrial was denied. The victim then answered the question as follows:
Well, to my understanding maybe she understood it wrong. I never said I was offered money to drop the charges. I was saying that ever since this happened I ended up losing a job. I was working in the oilfield. My wife is from Lake Charles area and she was a little bit scared to be at home often times so II was working nights and I was in Texas so I mean, I was going throughI've been going through a financial struggle since then. I never said that I was offered money. I asked her is there like any kind of way that I could get some kind of compensation because, you know, of my struggle and she told me about going to the policethe sheriff's department. Now the thing is, I never told her that nobody came and said well I'm going to give you some money to drop the charges. But they haveI have had times often to help get my car fixed because I didn't have any transportation but he never said I'll get your car fixed if you drop the charges. The man came to me like a man and apologized about the situation and we had a talk about everything that happened but the same time he offered to get my car fixed but he never said I'll get your car fixed if you drop the charges.
He further testified that he was basically trying to show the defendant mercy. Regarding the incident at the gym, he indicated that he had seen the fight between Lavarus and Derrick, but that he did not say anything to Derrick or make any threatening gestures toward him. Afterward, *455 he took Lavarus home. He then went to his apartment.
When he turned into the parking lot, he recognized the defendant and Derrick there. The defendant asked him if he had tried to jump Derrick. He replied that he had not touched him, and he testified that he thought the two might jump him, so he told them to wait a minute and he would be back. As he walked to the front door of the residence, he heard the defendant cursing him. He looked back in that direction and heard a gunshot, "so then I opened the door real quick because I was fixing to just call my brother's name and throw my wallet in ... I was just going to put my wallet and stuff in the house and by the time I turned and touched the front door and I was keeping my eyes towards them at the same time that's when I heard the gunshot as I was calling my brother's name."
The victim admitted talking to a Detective Ewing on November 13, 2006. He was asked to read from that statement in court, and he read a portion of the written statement in which he told the detective that he saw the defendant "raise the gun up and take a shot." He also read the following portion of the statement:
Then Terrance took the shot as I got right to the front door. And as I opened the front door, that's when the shot came simultaneously because as soon as I opened the door it just happened my brother put his head down and as soon as he put his head down, the bullet came through the wall.
On cross-examination, he was asked several questions about the sequence of events surrounding the shot being fired. He attempted to clarify by stating:
This situation it's more like as I was going in the house, I'm looking at my what's behind me because in my mind who knows they run up on memay run up on me as I turn my back so I'm calling my brother as I open the door and looking behind me. And as soon as I heard the gunshot, I look into the house where my brother is and that's when I noticed his head was down towards the Bible. Everything with the situation happened so fast.
He then was asked about his previous testimony in which he indicated he was not one hundred percent sure who shot at him. He testified:
Well, the truth is, I know from where where the gunI'm going to tell you this here. To me in my opinion the two brothers look pretty similar. Both of them have gold. It was dark. They both was standing pretty much in the same area right behind a tree at the apartment across from me. The gunshotthe gunfrom this side of the house and the reason why I thought to myself as I looked deep, I was pretty sure but being more than a hundred percent sure I wasn't so in the end my heart wouldn't lead me to do it if I just wasn't more than a hundred percent sure.
He then responded in the affirmative when asked if it was fair to say that despite what he may have said to the police officers, he was not one hundred percent sure who fired the shot.
On redirect, he admitted that when he came to see the prosecutor and signed a "drop charge slip" he was with the defendant and the defendant's father, Henry Mitchell, and that he never mentioned why he wanted to drop the charges or that he was not one hundred percent sure who fired the shot. He indicated that the first time he had told anyone that he was not sure the defendant fired the shot was when he testified that day. He then was asked, "Now isn't it true that you want to *456 show him some mercy but you know good and well in your heart that he did do it, don't you?" He responded, "To be perfectly honest, I want to show the man some mercy."
On recross, he further stated:
I mean, I want to show the man some mercy but what I'm saying is, I'm pretty sure that it was him that shot thethat shot thethat took the shot. Plus, it'sI don't knowI mean, it's just with dealing with this case I've never dealt with something even in thisthis matter. It's justit's mind boggling for me I mean and it's been a long time ago and so much happened so fast. I'm still pretty sure he did it but I ain't more than a hundred percent sure he did it.
On redirect, he admitted feeling sorry for the defendant. Before the victim left the stand he identified the "drop charge slip" he had signed, and it was introduced into evidence.
The State then called Detective Adam Ewing of the DeSoto Parish Sheriff's Office. He gave a detailed account of his investigation on the night of the incident and the results, and he testified that on that night the victim had told him that it was Terrance who shot at him and that the victim was sure of his identity. He also testified that on March 28, 2006, Derrick had come to see him and claimed that he, the brother, had fired the shot. However, Derrick could not tell Ewing the kind of gun or the caliber. Derrick told Ewing the following:
He just told me about the fight and about he was afraid that Derrick and his brother Lavarus were going to jump him later on and that's why he took it [the gun] to the projects instead of just leaving it alone at the court after it [the fight] got broke up. He went ahead and took it to the projects and he also advised he'd called Terrance to be there as a backup.
However, Ewing testified that he did not find Derrick's account sufficient to arrest him, and noted that the victim had advised that the defendant had shot at him and that the victim was sure it was Terrance and not the brother. When asked if the victim ever seemed doubtful as to who shot at him, Ewing responded in the negative; when asked if the victim seemed one hundred percent sure, Ewing responded, "He did to me."
On cross-examination, Ewing's testimony was used to introduce a written statement that Derrick had given to law enforcement, and Ewing admitted that it said substantially the same thing that Derrick had said to Ewing. He also admitted that he rejected Derrick's admission based in large part on what Derrick had told Ewing.
The last witness to testify was Officer Claude Bagley of the DeSoto Parish Sheriff's Office. He testified about the path of the bullet and about finding the bullet in the adjacent apartment. He testified that he talked to the victim who informed him that the defendant fired the bullet.
The defense did not cross-examine, and the State then rested. The defense moved for a directed verdict of acquittal; the motion was denied. The defense then rested. After closing arguments, the court found the defendant guilty of attempted manslaughter and aggravated criminal damage to property.
At a hearing conducted on January 15, 2008, a motion for new trial and, alternatively, for post-verdict judgment of acquittal was denied. Then, at the sentencing hearing conducted on January 24, 2008, the court sentenced the defendant to three years at hard labor on each offense, the sentences to run concurrently. This appeal followed.

*457 DISCUSSION
This case is essentially a sufficiency of the evidence case regarding identification of the shooter. In the defendant's first assignment of error, he asserts that the evidence is legally insufficient to sustain his conviction of attempted manslaughter and aggravated criminal damage to property. In his second assignment of error, the defendant argues that the trial court erred in denying his motion for a post verdict judgment of acquittal. The defendant's third assignment of error alleges that the trial court erred in denying the appellant's motion for a new trial. Due to the fact that these first three assignments of error are based on the same sufficiency of evidence argument, we will discuss them together.
The defendant asserts that the testimony of Derrick Brown is not legally sufficient to establish that the defendant is the person who fired the shot. To support this assertion, the defendant addresses Brown's testimony about not being sure as to who shot at him, arguing that Brown's testimony indicates that he was looking at his brother when the shot was fired, not at the direction from which the shot was fired.
The defendant also quotes from the testimony of Alonda Gossett, Shonda Brown, and Johnny Ray Brown to try to show that the victim was already in the apartment when the shot was fired. The defendant refers to Derrick's statement in which he confessed to being the person who fired the shot, arguing that Derrick would have to have known that when he made the statement he would be prosecuted for the offense. Finally, the defendant argues that the State failed to prove intent to kill where only one shot was fired, the shot hit a window, and the shot might have been fired as a warning.
Alternatively, the state argues that when the victim talked to law enforcement after the incident, he had no doubt that the defendant had shot at him. The State also notes that when Brown came in to drop the charges, he was accompanied by the defendant and the defendant's father. Finally, the state recognizes that only at trial did Brown deviate from his previous statements and say that he was not "more than one hundred percent sure" who fired the shot.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
Under the Jackson v. Virginia standard, we review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Bosley, 29,253 (La.App. 2 Cir. 4/2/97), 691 So.2d 347, State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921, cert. denied 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide *458 the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia and does not extend to credibility determinations made by the trier of fact. State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488 writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020; State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Parker, 42,311 (La.App. 2d Cir.8/15/07), 963 So.2d 497; State v. Owens, 30,903 (La. App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App. 2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App. 2d Cir. 5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App. 2d Cir. 1/27/06), 921 So.2d 219, writ denied, XXXX-XXXX (La.11/9/06), 941 So.2d 35.
When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hughes, XXXX-XXXX (La.11/29/06), 943 So.2d 1047; State v. Powell, 27,959 (La. App. 2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
When the evidence does not support a conviction of the crime charged, but supports a conviction on a lesser and included offense, this court is authorized to enter a judgment of guilty of the lesser and included offense. La. C. Cr. P. art. 821(E); State v. Houston, 40,642 (La.App. 2d Cir.3/10/06), 925 So.2d 690, writ denied, XXXX-XXXX (La.10/13/06), 939 So.2d 373; State v. Maxie, 33,982 (La.App. 2d Cir.11/1/00), 773 So.2d 198.
In giving great deference to the trial court's credibility decisions and weighing of the evidence, the trial court could have concluded under the Jackson standard that the victim's statements on the night of the incident were his most credible, because: (1) he made them immediately after *459 the incident; (2) he gave a later statement to Ewing that was not equivocal, (3) he was accompanied by the defendant and the defendant's father when he later sought to drop the charges; (4) he never expressed doubt until the day of trial; (5) he admitted at trial that he wanted to show the defendant mercy; and (6) even at trial he was "pretty sure" the defendant was the one who shot at him, although he wasn't "more than one hundred percent sure" that he did it.
Detective Ewing, the only other witness to testify as to who fired the shot, discussed Derrick admitting to firing the shot. However, Ewing did not believe him in light of the victim's statement, also noting that Derrick could not say what kind of gun was used or identify its caliber.
Furthermore, the testimony about where the victim was standing when the shot was fired, while not entirely clear, certainly indicated that he was in the process of entering the apartment at the time. There is no indication in the victim's testimony about the timing of the shot and his entrance into the apartment that would exclude him being able to see who fired the shot. Regarding the extent that Shonda Brown's testimony is inconsistent with the victim's account, the trial court could have believed Derrick's version. Thus, it essentially all comes down to Derrick's statements and testimony, and under Jackson, the trial court's decision to find the defendant guilty of attempted manslaughter should not be disturbed.
The defendant's argument concerning the lack of intent to kill also falls within the scope of Jackson. Viewing the evidence in the light most favorable to the prosecution, the State sufficiently proved the defendant's attempt to commit manslaughter pursuant to La. R.S. 14:31(A)(1) which reads:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
It is pure speculation that the shooter could have been firing a "warning shot"; the shot plainly was fired in the direction of the victim and at an inhabited apartment. If the shooter had only wanted to fire a warning shot, then he could have fired in another direction or into the ground.
The defendant's only argument about sufficiency as to aggravated criminal damage to property is his same argument about the identity of the shooter. La. R.S. 14:55, which defines the crime of aggravated criminal damage to property, provides in part:
Aggravated criminal damage to property is the intentional damaging of any structure, watercraft, or movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion.
All that was necessary in this case for the State to prove this offense was proof that the defendant intentionally damaged a structure "wherein it is foreseeable that human life might be endangered, by means other than fire or explosion." The shooter shot into an inhibited apartment. It is foreseeable that individuals would be present within that dwelling. The facts of this case clearly establish the elements of this offense.
For the reasons stated above, assignments of error one, two, and three are meritless.
*460 In the defendant's fourth and final assignment of error, he argues that trial counsel was ineffective in his representation.
The defendant argues that on November 22, 2006, defense counsel issued subpoenas for two witnesses, LaKendrick Lane and Malcolm Flowers, that there was no guarantee the subpoenas would be served in time for trial, that with the Thanksgiving holidays taken into account it was certain the subpoenas would not be timely served, and that the witnesses were not present at trial. The defendant contends that it is likely that if the witnesses had testified, the trial would not have resulted in the defendant's conviction because both of these witnesses would have testified about recent altercations that they had witnessed between Derrick and Lavarus, and their testimony would have shown that the shooting was a continuation of the previous altercation. Furthermore, defendant argues that defense counsel failed to subpoena Derrick, as a witness and that he would have testified "regarding his ongoing dispute with Derrick Brown." As a result, the defendant alleges that the actions/inactions of defense counsel constituted ineffective assistance.
The State asserts that there are several valid tactical reasons as to why a skilled defense attorney would not want Derrick to testify that he was the shooter. The State argues that one reason would be the attorney's duty not to suborn perjury. The State further argues that another reason would be that Derrick did not come forward with his alleged confession until almost a week after the shooting occurred and that this would have subjected him to a "rigorous cross-examination as to his veracity."
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief ("PCR") in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State v. Ellis, 42,520 (La.App. 2d Cir.9/26/07), 966 So.2d 139. A motion for new trial is also an accepted vehicle by which to raise such a claim. Id. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App. 2d Cir.9/27/95), 661 So.2d 673.
Obviously, if Derrick had testified, he would have been subjected to a "rigorous cross-examination as to his veracity" regardless of how long he waited to come forward. However, a clearer reason would simply be that Derrick was not called because he may well have not wanted to incriminate himself and defense counsel should not call him knowing he would be put in the position of having to invoke his Fifth Amendment right.
The effect of the testimony that would have been given by the other two potential witnesses is best evaluated pursuant to a PCR application with its opportunity for a full evidentiary hearing. In the interest of judicial economy, this is not a case in which ineffective assistance should be addressed on appeal. Therefore, this assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.
BROWN, C.J., concurs with reasons.
BROWN, Chief Judge, concurring.
The majority states, "[T]hus it essentially all comes down to (the victim's) statements and testimony ..." The majority *461 then finds that "the victim's (prior inconsistent) statements on the night of the incident were his most credible ..." Simply put, the majority disregarded the victim's trial testimony and accepted the victim's prior inconsistent statements to the police as substantive evidence of defendant's guilt. A prior inconsistent statement of a witness may be offered for the purpose of impeaching his credibility. It is circumstantial evidence from which the trier of fact may infer that the testimony of the witness is unreliable. It is not hearsay because the statement is not offered to prove the truth of the matter asserted. The orthodox rule is that prior inconsistent statements may be used to impeach, but should not be treated as having any substantive testimonial value. La. C.E. art. 607(D)(2).
The totality of the evidence at trial, however, demonstrates that defendant, acting in concert with his brother, was a principal in the shooting.[2] For that reason I concur in affirming the conviction and sentence.
NOTES
[1] The defendant did not assert an assignment of error regarding his actual sentence.
[2] In commenting on La. C.E. art. 607(D)(2) and its applicability in a similar case, the authors of The Handbook on Louisiana Evidence Law 2008 observe that "By calling the witnesses and then impeaching them, the prosecutor put before the jury out-of-court identifications of the accused which, despite any cautionary instructions, must have influenced them greatly." George W. Pugh, Robert Force, Gerald A. Rault, Jr., and Kerry Triche, Handbook on Louisiana Evidence Law 2008, La. C.E. art. 607, 2008 Authors' notes (9) at 492.